HEATHER K., a child, by next friends ANITA K. and Thomas K., Plaintiff,

v.

CITY OF MALLARD, IOWA, Defendant.

No. C 95–3048.

United States District Court, N.D. Iowa, Central Division.

May 25, 1995.

Blake Parker, Fort Dodge, IA, for plaintiff Heather K.

Michael L. Brown, Emmetsburg, IA, for defendant City of Mallard.

## ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER

BENNETT, District Judge.

This request for a temporary restraining order pursuant to Title II of the Americans With Disabilities Act, 42 U.S.C. § 12131 *et seq.*, by a 32–month old child who suffers from severe respiratory and cardiac conditions as a result of her extremely premature birth raises an unique issue of first impression in any court. That issue is whether or not a person suffering from the disabilities of this plaintiff is entitled to a temporary restraining order enjoining exceptions to a defendant municipality's ban on open burning that specifically allow for backyard burning of residential waste and other specified forms of open burning. The plaintiff asserts that backyard burning of such wastes aggravates her disabilities to a life-threatening degree, thus preventing her from enjoying the services, programs, and activities provided by the municipality by reason of her disability. The plaintiff has also moved for leave to prosecute this matter under a pseudonym.

## I. BACKGROUND

### A. Procedural Background

Plaintiff Heather K. filed an application to proceed in this matter *in forma pauperis* on May 22, 1995. That application was granted on May 23, 1995, and this lawsuit was filed on the same day. Also on May 23, 1995, Heather K. filed a motion for temporary restraining order and preliminary injunction and a motion to proceed under a pseudonym and for a protective order.

Plaintiff Heather K. is a child who, as the result of her premature birth, suffers from respiratory and cardiac conditions aggravat-

ed by particulates, such as smoke, in the air she must breathe. Her lawsuit is brought pursuant to Title II of the Americans With Disabilities Act (ADA), 42 U.S.C. § 12131 *et seq.* Title II of the ADA prohibits discrimination on the basis of disability in the provision of public services, and Part A of that Title, the relevant part here, prohibits such discrimination by a public entity. 42 U.S.C. §§ 12131, 12132.[1] In addition, Heather K. asserts a claim pursuant to the Rehabilitation Act, 29 U.S.C. § 701, specifically, section 794. The defendant is the City of Mallard, Iowa, the city in which Heather K. resides with her parents.

The complaint seeks temporary and permanent injunctive relief and damages as the result of alleged violations of Heather K.'s civil rights guaranteed by the ADA and the Rehabilitation Act. Specifically, Heather K. alleges that "Defendant has failed to pass a city ordinance imposing reasonable limita-

tions on the backyard burning of residential waste." Complaint, ¶ 1.[2] Heather K. seeks a temporary restraining order to require the City of Mallard to ban open burning or to impose reasonable limitations on open burning within the city limits. Heather K. alleges irreparable injury to her life and health as the result of the City's refusal to ban open burning, and, additionally, alleges that the City's inaction has caused her to be segregated from the rest of the Mallard community.[3] The complaint and motion for temporary restraining order and preliminary injunction are verified by an affidavit by Heather K.'s mother in which, *inter alia,* she describes Heather's physical condition, medical history, efforts to modify rooms to protect Heather's environment, and examples of situations in which open burning has caused Heather to be "immediately afflicted" by labored breathing and accelerated breathing rate. Jurisdiction over the complaint is alleged under 28

---

1. Paragraphs 24, 26, and 27 of the complaint also appear to assert claims under Title III, which prohibits discrimination on the basis of disability in public accommodations and services operated by *private* entities. 42 U.S.C. § 12181 *et seq.* Specifically, the complaint asserts violations of 42 U.S.C. § 12182(b)(2)(A)(ii) & (iii). However, counsel for plaintiff indicated at a preliminary telephone conference that it was his intention to withdraw any claims pursuant to Title III of the ADA as inapplicable to the circumstances and parties involved here. The court will therefore consider the action as proceeding only upon claims pursuant to Title II of the ADA.

2. The gravamen of Heather K.'s ADA claim is stated in paragraphs 24 and 25 of her Complaint:

24. Defendant, City of Mallard, has discriminated against Heather in violation of 42 U.S.C. § 12131 ... by refusing reasonable accommodations to Heather as a disabled individual through its failure to promulgate a city ordinance which reasonably restricts back yard burning within the city. Defendant's intentional disregard of Heather's rights under the A.D.A. and failure to accommodate her has caused Heather to be segregated from the rest of the community and has precluded Heather from enjoying all rights, privileges and accommodations available to other Mallard citizens.

25. The City of Mallard's refusal to pass a more restrictive city ordinance limiting the days and time that citizens of Mallard can participate in open burning contravenes 42 U.S.C. Sec. 12131 as Heather K. is thereby excluded from participation in and denied the benefits of the services, programs, and activities of the City of Mallard.

Although the Complaint twice refers to § 12131 of the ADA, that section in fact states only definitions. The operative provision of Title II of the ADA, the section prohibiting discrimination in the provision of services, is actually 42 U.S.C. § 12132. The court will construe the complaint pending amendment as alleging violation of that provision.

The gravamen of Heather K.'s Rehabilitation Act claim is stated in paragraph 30 of the Complaint:

30. The City of Mallard has subjected Heather K. to discrimination under a program or activity receiving federal financial assistance solely on the basis of handicap contrary to 29 U.S.C. Sec. 794.

3. The allegations of irreparable injuries are as follows:

20. As a result of the inaction of the Defendant, Plaintiff Heather K.'s health and life have been jeopardized. Exposure to even a small amount of smoke will cause an increase in Heather's respiratory rate and may pose dire consequences up to and including loss of life for Heather.

21. The present ordinance has caused Heather to be segregated, because of her disability, from the rest of the Mallard community. Heather is confined to her home or is forced to leave the community when burning takes place to avoid the serious ramifications to her health which back yard burning can cause.

22. There is no adequate remedy at law. Complaint, ¶¶ 20–22.

U.S.C. §§ 1331 (federal question), 1343 (civil rights), 2201 (declaratory judgment), and 2202 (further relief based on declaratory judgment).

The motion for temporary restraining order (TRO) and preliminary injunction, filed on May 23, 1995, asserts that the threat of irreparable harm to Heather K. is dramatically increased with the onset of spring and a resulting increase in backyard burning within the city limits of the City of Mallard.[4] As relief, Heather K. seeks, *inter alia,* the "issu[ance of] a temporary restraining order and/or a preliminary injunction ordering Defendant to ban all backyard burning within the city limits of Defendant City of Mallard during the pendency of this action." Motion For Temporary Restraining Order And Preliminary Injunction.

The court held a preliminary conference with counsel for the parties on May 23, 1995, and a hearing on the motion for temporary restraining order on May 24, 1995. Plaintiff Heather K. was represented by counsel Blake Parker of Fort Dodge, Iowa. Defendant City of Mallard was represented by counsel Michael L. Brown of Emmetsburg, Iowa. This matter was ably presented by counsel for both parties and the court appreciates the cooperation and collegiality of counsel in conducting the preliminary conference and TRO hearing.

At the TRO hearing, counsel for the parties agreed that the matter is proceeding at this point solely on the issue of the propriety of issuing a TRO in this matter. A further determination on the merits of plaintiff's mo-

tion for a preliminary injunction will therefore be made at a later date.

## B. Factual Background

The factual background for this case is drawn from the complaint, affidavit verifying the complaint, and brief of the plaintiff in support of the motion for temporary restraining order and preliminary injunction, and representations of counsel for both parties at the TRO hearing. Consequently, the facts found here are for the purposes of disposing of the motion for a TRO only.

Plaintiff Heather K. was born prematurely on September 18, 1992, after only 23 weeks gestation. Consequently, Heather suffers from bronchial pulmonary dysplasia.[5] Additionally, when Heather was ten months old, she was diagnosed with diffuse hemangiomatosis[6] with secondary congestive heart failure. As a result of these conditions, Heather cannot tolerate particulates, such as smoke, in the air she breathes without suffering symptoms such as increased respiratory rate, wheezing, and severe vomiting. Her symptoms vary with the amount of smoke or particulates in the air and the length of time she is exposed to such smoke or particulates. The nearest hospital with adequate facilities to deal with Heather's condition in the event of a crisis is in Ames, Iowa, some two and one-half hours from Mallard.

In order to alleviate their daughter's condition, Heather's parents have remodeled their home, installed air filters, and made other attempts to limit Heather's exposure to hazardous conditions. However, the City of Mallard allows open burning of residential

---

4. Specifically, the motion states the following:

> 5. The onset of spring increases the back yard burning activity within the city limits of Mallard placing Heather at significant risk to her health and life.
> 6. Plaintiff will suffer irreparable injury unless this Court issues a temporary restraining order and a preliminary injunction ordering Defendant to ban all back yard burning with[in] the city limits of the City of Mallard during the pendency of this action.

Motion For Temporary Restraining Order And Preliminary Injunction, ¶¶ 5–6.

5. "Bronchial" means "[r]elating to the bronchi," which are "the two subdivisions of the trachea

serving to convey air to and from the lungs," while "pulmonary" means "[r]elating to the lungs, to the pulmonary artery, or to the aperture leading from the right ventricle into the pulmonary artery," and, finally, "dysplasia" means "[a]bnormal tissue development." *Stedman's Medical Dictionary* 243, 245, 1464 (26th ed., 1995) (hereinafter, "*Stedman's Medical Dictionary*").

6. "Hemangiomatosis" means "[a] condition in which there are numerous hemangiomas," which are "congenital anomal[ies], in which proliferation of blood vessels leads to a mass that resembles a neoplasm." *Stedman's Medical Dictionary,* at 770.

waste at any time pursuant to City ordinance 105.05. That ordinance states, in pertinent part, that

No person shall allow, cause or permit open burning of combustible materials, except that the following shall be permitted:

1. Recreational Fires. Open fires for cooking, heating, recreation and ceremonies, provided they comply with the limits for emissions of visible air contaminants established by the State Department of Natural Resources.

2. Backyard Burning. Backyard burning of residential waste at dwellings of four-family units or less.

3. Training Fires. Fires set for the purpose of bona fide training of public or industrial employees in fire fighting methods, provided that the Executive Director receives notice in writing at least one week before such action commences.

4. Variance. Any person wishing to conduct open burning of materials not permitted herein may make application for a variance to the Executive Director.

Further definitions of terms used in this ordinance are set out in the margin.[7] The allowance of open burning pursuant to the ordinance means that Heather is at times subjected to smoke that is hazardous to her life and health.

Heather's parents have upon a number of occasions endeavored to convince the city council of the City of Mallard to pass a more restrictive open burning ordinance. Those efforts have thus far proved fruitless. Heather's parents also filed a complaint with the Equal Opportunity Officer of the Department of the Interior, which has resulted in the City of Mallard conducting a survey of its residents concerning the effects of open burning. No results of that survey have yet been produced[8] and no change in city ordinances has been advanced by any member of the city council.[9]

As spring approaches there is an increase in open burning in the City of Mallard. Heather and her parents therefore fear a dramatic increase in the risk to Heather's health. They assert further that because of the lack of an open burning ban, Heather is precluded by her disability from enjoying any and all public accommodations of the

---

7. The open burning ordinance, City of Mallard, Iowa, ordinance 105, defines "open burning" as "any burning of combustible materials where the products of combustion are emitted into the open air without passing through a chimney or stack." Ordinance 105.01 ¶ 8. "Residential waste" is defined as "any refuse generated on the premises as a result of residential activities. The term includes landscape wastes grown on the premises or deposited thereon by the elements, but excludes garbage, tires and trade wastes." Id. at ¶ 12. The wastes identified in the ordinance are also defined. "Garbage," for the purposes of the ordinance, "means all solid and semisolid, putrescible animal and vegetable wastes resulting from the handling, preparing, cooking, storing, serving and consuming of food or of material intended for use as food, and all offal, excluding useful industrial by-products, and includes all such substances from all public and private establishments and from all residences." Id. at ¶ 5. "Landscape waste" under the ordinance means "any vegetable or plant wastes except garbage. The term includes trees, tree trimmings, branches, stumps, brush, weeds, leaves, grass, shrubbery and yard trimmings." Id. at ¶ 6. Finally, "refuse" is defined as "putrescible and non-putrescible wastes, including but not limited to garbage, rubbish, ashes, incinerator residues, street cleanings, market and industrial solid wastes and sewage treatment wastes in dry or semi-solid form." Id. at ¶ 11. These definitions are in turn drawn from provisions of the Iowa Administrative Code, chapter 567, or from Iowa Code Ch. 455B.

8. At the TRO hearing, counsel for the City represented that the City has returned the survey to the Department of the Interior and is now awaiting a report of "findings" by the Department of the Interior.

9. Heather's parents have, however, suggested to the city council that open burning be limited to one Saturday per month during the months of April, May, September, October, and November, between the hours of 9:00 a.m. and 5:00 p.m., with one alternate rain day. They seek a total ban on open burning in all other months of the year. Heather's parents' suggestion does contemplate exceptions to the ban for cooking fuels, heating fuels, training fires, burning of disaster rubbish, ceremonial or controlled bonfires, and burning of dangerous materials when alternative means of disposal are unavailable. Their proposal would make violation of such an ordinance a simple misdemeanor punishable by a fine of $50.00, with second offenses fined $100.00. Enforcement would be by the fire chief or the fire chief's designee. See Exhibit C, Plaintiff's Memorandum.

City of Mallard enjoyed by all other citizens of the City when burning is taking place. Heather asserts that she is unable to use Mallard's public parks, occupy or travel on public streets or occupy public buildings with open windows or inadequate climate control, that she cannot attend public activities or functions held outside, or even play in her own backyard, take walks, or simply be outside if there is any likelihood of open burning taking place. At times, despite the efforts of her parents, smoke infiltrates Heather's house making it difficult for her to remain in town even in her own residence. Thus, Heather has been segregated because of her disability from the rest of the Mallard community.

## II. LEGAL ANALYSIS

### A. Prosecution Under A Pseudonym

Plaintiff seeks to prosecute this action under a pseudonym for fear of harassment that will result if she is required to disclose her identity. Generally, a person is required to disclose his or her identity to commence a lawsuit. *See* Fed.R.Civ.P. 10(a) (requiring that the complaint state the title of the action, which "shall include the names of all the parties.").[10] Although the Federal Rules of Civil Procedure do not expressly prohibit use of pseudonyms for purposes of litigation, courts have recognized that "lawsuits are public events and the public has a legitimate interest in knowing the facts involved in them. Among those facts is the identity of the parties." *Doe v. Deschamps,* 64 F.R.D. 652, 653 (D.Mont.1974).

Courts, however, have increasingly recognized an exception to this requirement in limited "matters of a sensitive and highly personal nature." *Id.* at 653; *see also Southern Methodist Univ. Ass'n of Women Law Students v. Wynne & Jaffe,* 599 F.2d 707 (5th Cir.1979). Plaintiffs have been allowed to proceed anonymously in matters involving abortion, reproduction and birth control, welfare cases involving illegitimate children, and homosexuality. *See James v. Jacobson,* 6

F.3d 233, 235 (4th Cir.1993) (holding that trial court abused its discretion in not permitting plaintiffs to proceed anonymously in medical malpractice case against physician who artificially inseminated patient with his own sperm); *Doe v. Stegall,* 653 F.2d 180, 185–86 (5th Cir.1981) (anonymity warranted to protect minor plaintiffs from possible risk of violence stemming from revelation of unpopular personal beliefs); *Doe v. Blue Cross & Blue Shield of R.I.,* 794 F.Supp. 72, 74 (D.R.I.1992) (permitting transsexual to use pseudonym in suit against insurance company for reimbursement of expenses incurred in sex change); *Candy H. v. Redemption Ranch,* 563 F.Supp. 505 (M.D.Ala.1983) (pseudonym permitted in suit by pregnant 19–year old); *Doe v. United Services Life Ins. Co.,* 123 F.R.D. 437, 439 (S.D.N.Y.1988) (permitting use of pseudonym because of sensitive privacy and retaliation concerns in suit by homosexual against insurance company alleging discriminatory practices). Such situations share a need to shelter the anonymous plaintiff from "social stigmatization, real danger of physical harm, or where the injury litigated against would occur as a result of the disclosure of the plaintiff's identity." *Doe v. Hallock,* 119 F.R.D. 640, 644 (S.D.Miss.1987).

The decision whether or not to allow the use of pseudonyms based on a need for anonymity in a particular lawsuit is left to the discretion of the trial court. *Jacobson,* 6 F.3d at 239; *Doe v. Frank,* 951 F.2d 320, 323 (11th Cir.1992); *Hallock,* 119 F.R.D. at 643; *See also Roe v. Borup,* 500 F.Supp. 127, 130 (E.D.Wis.1980). There is, however, no express standard to guide the court in making its decision. Neither the Supreme Court, nor the Eighth Circuit Court of Appeals, has provided instruction on this issue, though both have permitted prosecution of suits under pseudonyms. *See, e.g., Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Doe v. Poelker,* 497 F.2d 1063 (8th Cir.1974).

In *Doe v. Frank,* 951 F.2d 320 (1992), the plaintiff sought to proceed under a fictitious

---

10. "The intention of Rule 10 is to 'apprise the parties of their opponents and to protect the public's legitimate interest in knowing all the facts and events surrounding court proceedings.'" *Doe v. Hallock,* 119 F.R.D. 640, 643 n. 1. (S.D.Miss.1987) (quoting *Free Market Compensation v. Commodity Exchange, Inc.,* 98 F.R.D. 311, 312 (S.D.N.Y.1983)).

name to avoid social stigma that he argued would attach upon revelation of his alcoholism. The Eleventh Circuit concluded that a plaintiff may proceed anonymously in "exceptional cases," where he "has a substantial privacy right which outweighs the 'customary and constitutionally-embedded presumption of openness in judicial proceedings.'" *Id.* at 323 (quoting *Doe v. Stegall*, 653 F.2d 180, 186 (5th Cir.1981)). The court identified three circumstances common to those cases where a plaintiff was permitted to proceed under a fictitious name. Those circumstances were:

> (1) plaintiffs challenging governmental activity;
>
> (2) plaintiffs required to disclose information of the utmost intimacy; and
>
> (3) plaintiffs compelled to admit their intention to engage in illegal conduct, thereby risking criminal prosecution.

*Frank*, 951 F.2d at 323 (citing *Stegall*, 653 F.2d at 185). The factors enumerated in *Frank* and *Stegall* were not intended as a "'rigid, three-step test for the propriety of party anonymity.'" *Id.* (quoting *Stegall*, 653 F.2d at 185). The mere presence of one factor was not meant to be dispositive, but rather, these factors were "highlighted merely as factors deserving consideration." *Id.* Instead, a court must "carefully review all the circumstances of a given case and then decide whether the customary practice of disclosing the plaintiff's identity should yield to the plaintiff's privacy concerns." *Id.; see also Wynne & Jaffe*, 599 F.2d at 713.

■ In this case, Heather K. seeks to avoid disclosing her true name in order to protect herself against unwanted invasion of her personal privacy.[11] The court has reviewed the factors identified by the courts in *Frank* and *Stegall* and the circumstances of this case, and has concluded, under the facts here, that the need for anonymity is sufficiently compelling to permit plaintiff to proceed using a pseudonym. Accordingly, plaintiff's application for leave to proceed under a pseudonym is granted. Plaintiff's affidavit signed by her mother is also sealed and all parties herein shall take all reasonable steps to shield plaintiff's true identity.

### B. Standards For TROs and Preliminary Injunctions

Rule 65 of the Federal Rules of Civil Procedure provides for temporary restraining orders and preliminary injunctions as follows:

> Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

*Fed.R.Civ.P.* 65(d).[12]

This court has previously ruled that the standards for granting a temporary restraining order are the same as those for determining the propriety of issuing a preliminary injunction. *Sports Design and Development, Inc. v. Schoneboom*, 871 F.Supp. 1158, 1162 (N.D.Iowa 1995) (citing *S.B. McLaughlin & Co. v. Tudor Oaks Condominium Project*, 877 F.2d 707, 708 (8th Cir.1989)). Those standards in this circuit are set out in the seminal decision in *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 113 & n. 5 (8th Cir.1981) *(en banc)*.

#### 1. Dataphase And Its Progeny

##### a. Purpose And Standards For Preliminary Injunctions

■ The Eighth Circuit Court of Appeals has repeatedly cited the standards stated in *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640

---

**11.** The City counters that Heather's parents have stimulated and sought media attention in pressing their desires for a ban on open burning. Even if this is the case, the permanence of the record of a lawsuit makes it appropriate to grant plaintiff's request.

**12.** *Fed.R.Civ.P.* 65(b) provides extensive requirements for the issuance of a TRO when the adverse party receives no notice. However, in this case, the adverse party has been provided notice and has appeared through counsel to argue the merits of a TRO.

F.2d 109, 113 & n. 5 (8th Cir.1981) (*en banc*), as the basis on which courts are to determine whether or not to issue a preliminary injunction. *See, e.g., Kirkeby v. Furness,* 52 F.3d 772, 774 (8th Cir.1995); *In re Y & A Group Sec. Litigation,* 38 F.3d 380, 383 (8th Cir. 1994); *Baker Elec. Co-op., Inc. v. Chaske,* 28 F.3d 1466, 1472 (8th Cir.1994); *City of Timber Lake v. Cheyenne River Sioux Tribe,* 10 F.3d 554, 556 (8th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2741, 129 L.Ed.2d 861 (1994); *Aziz v. Moore,* 8 F.3d 13, 15 (8th Cir.1993); *Sanborn Mfg. v. Campbell Hausfeld/Scott Fetzer Co.,* 997 F.2d 484, 485–86 (8th Cir.1993); *Aswegan v. Henry,* 981 F.2d 313, 314 (8th Cir.1992); *Frank B. Hall & Co. v. Alexander & Alexander, Inc.,* 974 F.2d 1020, 1023 (8th Cir.1992); *Cellular Sales, Inc. v. Mackay,* 942 F.2d 483, 485 (8th Cir. 1991); *Glenwood Bridge, Inc. v. City of Minneapolis,* 940 F.2d 367, 369 (8th Cir.1991); *Tullos v. Parks,* 915 F.2d 1192, 1193 (8th Cir.1990). One of the most recent formulations of the *Dataphase* standards is as follows:

> When considering a motion for a preliminary injunction, a district court weighs the movant's probability of success on the merits, the threat of irreparable harm to the movant absent the injunction, the balance between the harm and the injury that the injunction's issuance would inflict on other interested parties, and the public interest. *Dataphase Sys., Inc. v. CL. Sys., Inc.,* 640 F.2d 109, 114 (8th Cir.1981) (*en banc*). We reverse the issuance of a preliminary injunction only if the issuance "is the product of an abuse of discretion or misplaced reliance on an erroneous legal premise." *City of Timber Lake v. Cheyenne River Sioux Tribe,* 10 F.3d 554, 556 (8th Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2741, 129 L.Ed.2d 861 (1994).

*Pottgen v. Missouri State High Sch. Activities Ass'n,* 40 F.3d 926, 929 (8th Cir.1994); *see also Kirkeby,* 52 F.3d at 774 (listing the same factors); *Timber Lake,* 10 F.3d at 556 (review is for abuse of discretion or erroneous legal premise); *Aswegan,* 981 F.2d at 314

(abuse of discretion or erroneous legal premise review); *Frank B. Hall,* 974 F.2d at 1023 (same); *Tullos,* 915 F.2d at 1196. The burden of establishing the propriety of a preliminary injunction is on the movant. *Baker Elec. Co-op.,* 28 F.3d at 1472; *Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.,* 871 F.2d 734, 737 (8th Cir.1989) (*en banc*). The movant's burden is particularly heavy in those cases where granting the preliminary injunction will give that party substantially the relief it would obtain after a full trial on the merits. *Sanborn Mfg.,* 997 F.2d at 496 (citing *Dakota Indus., Inc. v. Ever Best Ltd.,* 944 F.2d 438, 440 (8th Cir. 1991) (hereinafter *Ever Best*)).[13]

### b. The Individual Factors And Their Relationship

"No single [*Dataphase*] factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction." *Baker Elec. Co-op.,* 28 F.3d at 1472 (quoting *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.,* 815 F.2d 500, 503 (8th Cir.1987) (hereinafter *Lenox Labs.*), and also citing *Dataphase*); *Sanborn Mfg.,* 997 F.2d at 486 (citing *Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.,* 824 F.2d 665, 667 (8th Cir.1987) (hereinafter *Parfums de Coeur*)); *Sanborn Mfg.,* 997 F.2d at 486 (quoting *Dakota Indus., Inc. v. Dakota Sportswear, Inc.,* 988 F.2d 61, 64 (8th Cir.1993) (hereinafter *Dakota Indus.*)); *Frank B. Hall,* 974 F.2d at 1023; *see also In re Y & A,* 38 F.3d at 383 (focusing on appeal in that case on court's determination of likelihood of success on the merits); *ILQ Inv., Inc. v. City of Rochester,* 25 F.3d 1413, 1416 (8th Cir.) (focus on appeal also success on the merits), *cert. denied,* —— U.S. ——, 115 S.Ct. 578, 130 L.Ed.2d 493 (1994); *S & M Constructors, Inc. v. Foley Co.,* 959 F.2d 97, 98 (8th Cir.) (district court applied only one of the *Dataphase* factors, likelihood of success on the merits, but the appellate court applied all of the *Dataphase* factors on appeal while noting

---

**13.** The court concludes that this is not such a case. The TRO will grant only temporary relief during which time the need for protection will not be permanently eliminated, as might be the case where restraining some activity past a specific date or deadline eliminates the need for further restraints in the future.

that likelihood of success on the merits was the most significant factor under the circumstances), *cert. denied,* —— U.S. ——, 113 S.Ct. 184, 121 L.Ed.2d 129 (1992); *James River Flood Control Ass'n v. Watt,* 680 F.2d 543, 544–45 (8th Cir.1982) (*per curiam*) (court must apply all of *Dataphase* factors).

Despite this requirement that the court consider all of the factors, in this circuit "a party moving for a preliminary injunction is required to show the threat of irreparable harm," *Baker Elec. Co-op.,* 28 F.3d at 1472 (citing *Modern Computer Sys.,* 871 F.2d at 738, and *Dataphase*), and the lack of irreparable harm is sufficient ground for denying or vacating a preliminary injunction. *Aswegan,* 981 F.2d at 314 (citing *Modern Computer,* 871 F.2d at 738). To put it another way, "[t]he threshold inquiry is whether the movant has shown the threat of irreparable injury." *Glenwood Bridge,* 940 F.2d at 371 (quoting *Gelco Corp. v. Coniston Partners,* 811 F.2d 414, 418 (8th Cir.1987)). Thus, the Eighth Circuit Court of Appeals has held that

> the movant's failure to sustain its burden of proving irreparable harm ends the inquiry "and the denial of the injunctive request is warranted." [*Gelco,* 811 F.2d] at 420. *Accord Modern Computer Sys.,* 871 F.2d at 738; *Dataphase,* 640 F.2d at 114 n. 9. We must inquire, then, whether [movant] has met its burden of proving that it will suffer irreparable harm absent a preliminary injunction.

*Id.*

■ ***i. Likelihood Of Success On The Merits.*** The first factor considered by the courts under *Dataphase* when ruling on an

application for a TRO or preliminary injunction is the likelihood or probability of success on the merits. *Pottgen,* 40 F.3d at 929. When considering this factor, the court is not deciding whether the movant for a preliminary injunction will ultimately win. *Glenwood Bridge,* 940 F.2d at 371; *O'Connor v. Peru State College,* 728 F.2d 1001, 1002 (8th Cir.1984) (in such preliminary proceedings, "the court should avoid deciding with any degree of certainty who will succeed or not succeed."). In isolation, the likelihood of success on the merits is meaningless. *Glenwood Bridge,* 940 F.2d at 371 (quoting similar language in *Dataphase*). Therefore, the court must consider other factors, especially the threat of irreparable harm. *Id.*

■ Likelihood of success on the merits requires that the movant find support for its position in governing law. *See, e.g., Baker Elec. Co-op.,* 28 F.3d at 1473–74 (Indian tribe's sovereignty to regulate electrical services); *ILQ Investments,* 25 F.3d at 1416 (first amendment and prior restraint of expression); *Timber Lake,* 10 F.3d at 556–58 (Indian tribe's regulatory authority and authority of states to regulate activities on tribal lands); *Aziz,* 8 F.3d at 15 (denial of injunctive relief proper because federal courts "must abstain from imposing injunctions on prison officials [in an action under 42 U.S.C. § 1983 action] 'in the absence of a concrete showing of a valid claim and constitutionally mandated directives for relief,'" quoting *Rogers v. Scurr,* 676 F.2d 1211, 1214 (8th Cir.1982)). In order to weigh in the movant's favor, the movant's success on the merits must be "at least ... sufficiently likely to support the kind of relief it requests."[14]

---

**14.** Another circuit court of appeals has recently described the meaning of likelihood of success on the merits and its interplay with the balance of harms as follows:

> What is true is that if the party seeking the preliminary injunction would suffer more harm from the denial of it than his opponent would suffer from its being granted, the injunction should be granted even if the party seeking it has no more than a 50–50 chance of winning, and even, in some cases, if the odds are worse. If for example the party seeking the injunction would lose $10,000 if it was denied, and has a 40 percent chance of being in the right, and the other party would lose

only $1,000 if the injunction is granted and has (necessarily) a 60 percent chance of being in the right, then the cost of denial of the injunction to the party seeking it, when discounted by the probability that he is in the right, would exceed the cost of granting the injunction to the other party, when discounted by the probability of his being in the right. (That is, $4,000 ($10,000 × .40) is greater than $600 ($1,000 × .60).). E.g., *Green River Bottling Co. v. Green River Corp.,* 997 F.2d 359, 361 (7th Cir.1993); *Curtis v. Thompson,* 840 F.2d 1291, 1296 (7th Cir.1988). But if as in this case the judge, having obtained in the preliminary hearing all the facts that [the judge] believes pertinent to deciding which party is in the right, is able to

*Sanborn Mfg.*, 997 F.2d at 488 (action under the Lanham Act in which the court concluded that either result argued by the opposing parties was directly supported by the evidence presented).[15]

■ *ii. Threat Of Irreparable Harm.* The next factor in the *Dataphase* analysis is the "threat of irreparable harm to the movant absent the injunction." *Pottgen*, 40 F.3d at 929. Sufficient showing on this factor can be made, for example, by showing that the movant has no adequate remedy at law. *Baker Elec. Co-op.*, 28 F.3d at 1473. Conversely, where the movant has an adequate legal remedy, a preliminary injunction will not issue. *Frank B. Hall*, 974 F.2d at 1025 (but finding in that case that the district court's conclusion that there was an adequate remedy was based on an erroneous legal premise, and requiring a proper balance of *Dataphase* factors).

■ However, the fact that Heather K. may assert a valid damages claim does not necessarily preclude issuance of a preliminary injunction, because damages relief may not fully compensate the movant for being denied its rights. *Glenwood Bridge*, 940 F.2d at 371–72. This is because, even when money damages are available to compensate for some of the harm to the plaintiff, other less tangible injuries cannot be so easily valuated or compensated. *Id.*

Irreparable harm will not be found where alternatives already available to the plaintiff make an injunction unnecessary. For example, in the context of a request for a preliminary injunction to protect a prisoner's right of access to the courts, if the prisoner is able to use existing methods of access to the

courts, the prisoner has failed to show either irreparable harm or prejudice. *Aswegan*, 981 F.2d at 314. The present case does not present such circumstances, however.

■ *iii. Balance Of Harm.* The court notes that the analysis of the next *Dataphase* factor, "the balance between the harm and the injury that the injunction's issuance would inflict on other interested parties, and the public interest," *Pottgen*, 40 F.3d at 929, is not identical to the "irreparable harm" analysis. Irreparable harm focuses on the harm or potential harm to the plaintiff of the defendant's conduct or threatened conduct. *Dataphase*, 640 F.2d at 114. In contrast, the balance of harm analysis examines the harm of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties, including the public, as well. *Id.; see also Glenwood Bridge*, 940 F.2d at 372 (considering the effect of granting or denying the injunction on the public's interest in a public works construction project as well as upon the parties in the balance of harm analysis); *Modern Computer Sys.*, 871 F.2d at 737–38 (harm to other interested parties also considered).

■ In conducting the balance of harm analysis required under *Dataphase*, it is obvious that an illusory harm to the movant will not outweigh any actual harm to the nonmovant. *Frank B. Hall*, 974 F.2d at 1023. To determine what must be weighed, the court finds that courts of this circuit have looked at the threat to the each of the parties' rights that would result from granting or denying the injunction. *Baker Elec. Co-op.*, 28 F.3d at 1473. Also, the potential economic harm to each of the parties and to interested third

make up [his or her] mind that the party seeking the injunction has no legal ground for his case, [the judge] should not only deny the injunction, [he or she] should dismiss the suit; for [the judge] knows how it will come out. *Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 945 (7th Cir.1994).

**15.** Special considerations for the analysis of the "success on the merits" requirement have also been articulated for certain areas of the law in which preliminary injunctions are specifically authorized by statute. *See, e.g., Dakota Indus.*, 988 F.2d at 64 (15 U.S.C. § 1116(a) authorizes a registered trademark owner to petition for in-

junctive relief for trademark infringement, and *SquirtCo. v. Seven–Up Co.*, 628 F.2d 1086, 1091 (8th Cir.1980), identifies the factors in a "success on the merits" analysis for a trademark case); *Mutual of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 399 (8th Cir.1987), *cert. denied*, 488 U.S. 933, 109 S.Ct. 326, 102 L.Ed.2d 344 (1988) (same); *SquirtCo.*, 628 F.2d at 1091 (identifying several factors to be considered in the "success on the merits" analysis in a trademark case); *Cellular Sales*, 942 F.2d at 486 (standard of proof for plaintiff seeking preliminary injunction varies depending on the strength or type of mark at issue).

parties of either granting or denying the injunction is relevant. *Id.* Another consideration in the balance of harm calculus is whether the defendant has already voluntarily taken remedial action. *Sanborn,* 997 F.2d at 489. Where the nonmovant has taken such action, the balance of harms is readjusted, because the potential for economic or other harm to the movant has been eliminated. *Id.* (citing *Burndy Corp. v. Teledyne Indus., Inc.,* 748 F.2d 767, 774 (2d Cir.1984), which held that injunctive relief was "wholly unnecessary" when the defendant had voluntarily brought his product labeled with the UL mark into compliance with UL standards and where there was not a likelihood of repetition or hazard to the public.). Similarly, present harm as the result of past misconduct is not sufficient to justify the injury to the nonmovant of granting a preliminary injunction requiring some additional corrective action, because such relief "goes beyond the purpose of a *preliminary* injunction." *Id.* at 490 (emphasis in the original).

***iv. The Public Interest.*** The final factor in the *Dataphase* analysis is the impact of granting or denying the preliminary injunction upon the public interest. *Pottgen,* 40 F.3d at 929. The "public interest" factor frequently invites the court to indulge in broad observations about conduct that is generally recognizable as costly or injurious.[16] However, in this case, the court finds no difficulty in identifying the public interests at stake by referring to the purposes and interests the ADA was intended to serve. Those interests will be discussed in some detail in the appropriate place below.

## C. The propriety of a TRO in this case
### 1. Irreparable harm

 The court finds that the record before it easily establishes that some of the *Dataphase* factors weigh in favor of granting Heather K.'s motion for a TRO. First, the "threshold" element of irreparable harm is sustained by the pleadings. *Baker Elec. Co-*

op., 28 F.3d at 1472 (movant must show irreparable harm); *Aswegan,* 981 F.2d at 314 (lack of irreparable harm sufficient alone to deny preliminary injunction); *Glenwood Bridge,* 940 F.2d at 371 (irreparable harm is "threshold inquiry" in granting or denying preliminary injunction). Continued open burning poses a very real health threat, possibly even a mortal threat, to Heather K. *Harris v. Blue Cross Blue Shield of Mo.,* 995 F.2d 877, 879 (8th Cir.1993) ("We entertain no question but that irreparable injury exist[s]" when the harm contemplated is "a life threatening illness."). At the very least, the threat posed by the lack of a ban or adequate restrictions on open burning is that Heather K. will be ejected from her current residence as it is made untenable by an excessive level of particulates from which the filtration system cannot provide adequate protection. *Johnson v. United States Dept. of Agriculture,* 734 F.2d 774, 789 (11th Cir.1984) (irreparable harm in wrongful loss of home).

 Finally, Heather K. has asserted, and the court finds for the purposes of a TRO, that Heather K. has no adequate remedy at law. *Baker Elec. Co-op.,* 28 F.3d at 1473. Only restraining open burning can prevent the threatened harm to Heather K.'s life and health. Thus, the "irreparable harm" factor weighs in favor of granting a TRO in this case.

### 2. Balance of harms

 Similarly, there is little doubt that "the balance between the harm and the injury that the [TRO's] issuance would inflict on other interested parties," *Pottgen,* 40 F.3d at 929, weighs in favor of granting a temporary restraining order here. The balance of harm here shows that granting the TRO will harm the City and other interested parties little, if at all, but denying injunctive relief poses a real and immediate threat to Heather K. *Dataphase,* 640 F.2d at 114; *Glenwood Bridge,* 940 F.2d at 372. For example, on

---

16. The "public interest" factor involves, among other things, the "public's interest in minimizing unnecessary costs" to be met from public coffers. *Baker Elec. Co-op.,* 28 F.3d at 1474 (citing *James River Flood Control Ass'n v. Watt,* 680 F.2d 543, 544–45 (8th Cir.1982) (*per curiam* )); *James River*

*Flood Control Ass'n,* 680 F.2d at 544–45 (public interest served by avoiding "greater expenditures from the public treasury"). The public interest also favors enjoining false statements, and enjoining the safety risks arising from false labelling of products. *Sanborn Mfg.,* 997 F.2d at 490.

the record before the court at this time, it appears that residents of Mallard have other, reasonably convenient means of disposing of waste they might otherwise burn. Heather K. has identified trash collection, composting of yard wastes, and a city "tree dump" as readily available alternatives.

The City counters that a ban on open burning may impose hardships on some residents, particularly the elderly, who cannot easily cart residential waste to alternate disposal sites. For these people, backyard burning may be the only reasonable means of disposing of certain kinds of residential waste. However, for the limited duration of a TRO, the court finds that little or no hardship is likely to be imposed on anyone, but the risk to Heather of not granting a TRO is too serious to be outweighed.

Furthermore, it must be remembered that the burning of yard wastes is an *exception* to the general prohibition on open burning embodied in Mallard City Ordinance 105.05. Although at certain seasons it may be an exception that swallows the rule, nonetheless, for the majority of the year there is simply no necessity to burn wastes of any kind. Under the ordinance, certain dwellings, those with over four family units, are prohibited from conducting any open burning at all of "residential wastes." These residences must have some provision for disposing of their wastes, and it is not too great a presumption that such facilities would also be available to the general populace.

Finally, there can be no implication that the harm alleged to threaten Heather K. is merely illusory. *Frank B. Hall*, 974 F.2d at 1023. Heather K. has produced adequate evidence of the very real threat to her health that results from exposure to particulates such as smoke. Her right to health is threatened, while no right of the defendant has even been identified as having been implicated by a ban on open burning. *Baker Elec. Co-op.*, 28 F.3d at 1473. Nor is there evidence that alternative means of disposal impose significant potential economic harm

upon the City, or that burning restrictions would impose any economic harm of any kind. *Id.*[17] The city council of Mallard has thus far refused to take any voluntary remedial action, so that Heather's risk of harm is both immediate and continuing. *Sanborn*, 997 F.2d at 489–90. The court therefore turns to the two remaining *Dataphase* factors, likelihood of success on the merits and public interest. Both of these factors require the court to consider the purposes of the ADA and its prohibitions and protections.

### 3. Likelihood of success on the merits

 Likelihood of success on the merits obviously depends in large part upon whether the movant's claim finds support for in governing law. *See, e.g., Baker Elec. Co-op.*, 28 F.3d at 1473–74; *ILQ Investments*, 25 F.3d at 1416; *Timber Lake*, 10 F.3d at 556–58; *Aziz*, 8 F.3d at 15. The anti-discrimination provision of Title II of the ADA provides as follows:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. A "qualified individual with a disability" is defined under this Title of the ADA as

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131.

The record before the court for the purposes of ruling on the motion for a TRO provides little doubt that Heather K. is a

---

**17.** The court recognizes that there may be potential economic harm resulting from the necessity to provide alternate means of disposal—costs of collection, haulage, landfill use, etc. However, the City has not had an opportunity, because of the expedited nature of TRO proceedings to provide any evidence of these costs. These costs may well be of some significance in the court's consideration of requests for a preliminary or permanent injunction.

"qualified individual with a disability." 42 U.S.C. § 12131. The record adequately demonstrates that Heather K. is disabled. However, nothing about her disability prevents her from meeting the "essential eligibility requirements" for receipt of the services, programs, or activities of the City of Mallard, which are only that she be present in the City and seeking to use public facilities. *See Concerned Parents to Save Dreher Park Ctr. v. City of West Palm Beach*, 846 F.Supp. 986 (S.D.Fla.1994) (only essential eligibility requirement for disabled individuals challenging elimination of city-sponsored recreation programs for disabled individuals was to request benefits of recreational program); *Coleman v. Zatechka*, 824 F.Supp. 1360 (D.Neb.1993) (only essential eligibility requirement for university housing by applicant with cerebral palsy was admission to university and application for residence hall housing). Nor is there any suggestion that Heather K.'s desire to use such programs, services, or activities will somehow pose a threat to the health or safety of others. *Pottgen v. Missouri State High School Activities Ass'n*, 857 F.Supp. 654 (E.D.Mo.1994) (person was disabled within meaning of ADA and was qualified to participate in high school sports program as long as his disability, age and a learning disability, did not pose a direct threat to the health or safety of other participants).

For the purposes of a TRO, the court finds that by reason of her disability, Heather K. has been and continues to be denied "participation in ... the benefits of the services, programs, or activities of" the City of Mallard. 42 U.S.C. § 12132. She is unable to use Mallard's public parks, occupy or travel on public streets or occupy public buildings with open windows or inadequate climate control, she cannot attend public activities or functions held outside, or even play in her own backyard, take walks, or simply be outside if there is any likelihood of open burning taking place. *See, e.g., Kinney v. Yerusalim*, 9 F.3d 1067 (3d Cir.1993) (streets and sidewalks were city services); *Tyler v. City of Manhattan, Kan.*, 857 F.Supp. 800 (D.Kan. 1994) (streets and sidewalks were services of city); *Concerned Parents*, 846 F.Supp. 986 (recreational programs were "service, program, or activity" of city).

Also, for the purposes of a TRO, the court finds that the impediments to Heather K.'s enjoyment of these services, programs, and activities is just as real and concrete as that posed, for example, by the lack of curb cuts, *Kinney*, 9 F.3d 1067; *Tyler*, 857 F.Supp. 800, or failure to fund recreations programs. *Concerned Parents*, 846 F.Supp. 986. Furthermore, the impediment here, excessive particulates or smoke in the air adversely affecting a person with Heather's disability, is within the power of the City to eliminate. *See, e.g., Kinney*, 9 F.3d 1067 (city could eliminate impediment caused by lack of curb cuts when it undertook sidewalk and curb modifications for other reasons); *see also Tyler*, 857 F.Supp. 800; *Concerned Parents*, 846 F.Supp. 986. The City has already undertaken to regulate open burning within its city limits; it therefore has the power and capacity to regulate such burning sufficiently to reasonably accommodate a person with Heather's disability.

Heather K. argues that the City's power to regulate open burning is similar to the power of prison officials to regulate smoking in cells to protect inmates from the dangers of second-hand smoke, citing *Helling v. McKinney*, — U.S. —, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). However, the court finds that at least as apposite on this question is the regulation of smoking within public buildings or buildings open to the public. *See, e.g., Staron v. McDonald's Corp.*, 4 ADA Cases 353, 355, 51 F.3d 353 (2d Cir.1995) (ADA provided authority to ban smoking in restaurant open to the public); *Vickers v. Veterans Admin.*, 549 F.Supp. 85, 87–89 (W.D.Wash.1982) (reasonableness of smoking ban in veterans hospital sought by disabled person with allergy to smoke under Rehabilitation Act); *but see Emery v. Caravan of Dreams, Inc.*, 4 ADA Cases 409, 879 F.Supp. 640 (N.D.Tex.1995) (theatre's failure to ban smoking was not discriminatory to disabled persons with respiratory ailments). These cases show that the ADA can be used as a vehicle to compel an entity to regulate the conduct of nonparties that is injurious to a disabled person

when the means to do so are within the power of that entity.

The court initially expressed some concern on the issue of success on the merits, because the court had some doubt that it could compel the City to pass the specific ordinance Heather K. seeks to have imposed.[18] The court doubted its power to compel the City Council to pass legislation on the grounds of separation of powers and comity. However, upon fuller review, the court finds, at this TRO posture of the litigation, that it need do no more than enjoin certain exceptions within the City's ordinance providing a general ban on open burning. This kind of judicial intervention is plainly within the power of the court. Thus, at least for the purposes of a TRO, Heather K. has established sufficient likelihood of success on the merits. *Glenwood Bridge,* 940 F.2d at 371 (when considering likelihood of success on the merits, the court is not deciding whether the movant for a preliminary injunction will ultimately win); *O'Connor v. Peru State College,* 728 F.2d 1001, 1002 (8th Cir.1984) (in such preliminary proceedings, "the court should avoid deciding with any degree of certainty who will succeed or not succeed").

### 4. Public interest

The public interest relevant here is embodied in the legislative history of the ADA itself. That public interest strongly favors granting a TRO in this case. The court therefore turns next to an examination of the legislative history of the ADA.

### a. The Origins Of The ADA

The ADA and its attendant regulations were enacted, in part, to address perceived inadequacies in the Rehabilitation Act of 1973, 29 U.S.C. § 794. *Helen L. v. DiDario,* 46 F.3d 325, 329 (3d Cir.1995) (describing in detail the history of Congressional efforts to attack disability discrimination). Congress found that section 504 of the prior act, 29 U.S.C. § 794, simply was not working as a means of eradicating discrimination and segregation on the basis of disability in this country. For example, Congress found that, even though section 504 had been the law for seventeen years,

> society has tended to isolate and segregate individuals with disabilities, and despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem.

42 U.S.C. § 12101(a)(2). Because Congress found further that public officials historically have been among the major perpetrators of segregated services in this country, *see* Timothy M. Cook, *The Americans With Disabilities Act: The Move To Integration,* 64 TEMP. L.REV. 393, 400, 416 (identifying state laws mandating segregation of persons with disabilities and suggesting an analogy with the "Jim Crow laws" mandating racial discrimination), Title II of the ADA, 42 U.S.C. §§ 12131–12134, incorporates the "non-discrimination principles" of section 504 of the Rehabilitation Act, but extends them to state and local governments. *Helen L.,* 46 F.3d at 331; *Easley v. Snider,* 36 F.3d 297, 300 (3d Cir.1994).[19] The ADA was not the first at-

---

**18.** Heather K.'s complaint appears to request that the court order the City to pass an ordinance embodying terms similar to those her parents have proposed, *see* footnote 9. The complaint speaks of relief in terms of "order[ing] ... Defendant to ban open burning or to impose reasonable limitations on open burning within the city limits," and imposing an injunction "until a city ordinance is adopted by the City of Mallard imposing reasonable restrictions on open burning with[in] the City's limits." Complaint, ¶ 1, prayer for relief ¶ B.

**19.** These congressional findings are similar to those of Justice Stevens and Justice Marshall in their concurrences in *Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), a case involving discrimina-

tion against the mentally retarded. Justice Stevens found that "through ignorance and prejudice the mentally retarded 'have been subjected to a history of unfair and often grotesque mistreatment.'" *Cleburne,* 473 U.S. at 455, 105 S.Ct. at 3262 (Stevens, J., concurring). Similarly, Justice Marshall found that

> [a] regime of state-mandated segregation and degradation soon emerged that in its virulence and bigotry rivaled, and indeed paralleled, the worst excesses of Jim Crow. Massive custodial institutions were built to warehouse the retarded for life; the aim was to halt reproduction of the retarded and "nearly extinguish their race." Retarded children were categorically excluded from public schools, based on the false stereotype that all were ineducable and

tempt to address the limitations of existing legislation to eradicate discrimination on the basis of disabilities. Periodically through the mid–1980s there had been attempts to amend the Civil Rights Act of 1964 to include people with disabilities. *See, e.g.,* H.R. 370, 99th Cong., 1st Sess. (1985). In 1983, the United States Commission of Civil Rights observed that "[h]andicap discrimination and, as a result, its remedies differ in important ways from other types of discrimination and their remedies," therefore disability rights laws explicitly modelled on prior civil rights statutes were not necessarily effective. U.S. COMM'N ON CIVIL RIGHTS, ACCOMMODATING THE SPECTRUM OF INDIVIDUAL ABILITIES 48, 149 (1983). A federal judge had a more blunt assessment:

> [T]he Title VII and Title IX models were not automatically adaptable to the problem of discrimination against the handicapped, but involved a very different undertaking.
>
> Indeed, attempting to fit the problem of discrimination against the handicapped into the model remedy for race discrimination is akin to fitting a square peg into a round hole....

*Garrity v. Gallen,* 522 F.Supp. 171, 206 (D.N.H.1981). Another commentator identified more specific weaknesses of prior laws that attempted to address disability discrimination:

> Problems involved in trying to transfer principles and legal analysis developed in race and sex discrimination cases wholesale to disability discrimination were interwoven with other difficulties and shortcomings of disability nondiscrimination statutes prior to the ADA. Experience with the application of such prior statutes, including section 504 of the Rehabilitation Act of 1973, uncovered or highlighted weaknesses of such laws arising from their statutory language, the limited extent of their coverage, inadequate enforcement mechanisms, and erratic judicial interpretations. Legal commentators have extensively described and lamented the flaws in the working, interpretation, and implemen-

tation of federal disability nondiscrimination statutes prior to the ADA.

Robert L. Burgdorf, Jr., *The Americans With Disabilities Act: Analysis And Implications Of A Second–Generation Civil Rights Statute,* 26 Harv.C.R.–C.L.L.Rev. 413, 430–31 (1991) (footnotes omitted).

In enacting the ADA, Congress found that "[h]istorically, society has tended to isolate and segregate individuals with disabilities, and ... such forms of discrimination ... continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). *Helen L.,* 46 F.3d at 332. The purpose of the ADA in light of this history of discrimination was summarized by Congressman Dellums:

> The history of different, separate, and unequal treatment of persons with disabilities, especially those with severe disabilities, could not be clearer. That history is in fact a stark reminder of the prejudice and misunderstanding that has characterized the treatment of minority citizens. This disparate treatment establishes an abundant factual predicate for the relief granted by [the ADA]. The Americans With Disabilities Act is a plenary civil rights statute designed to halt all practices that segregate persons with disabilities and those which treat them inferior [sic] or differently. By enacting the ADA, we are making a conscious decision to reverse a sad legacy of segregation and degradation.

136 CONG.REC. H2599 (daily ed. May 22, 1990) (statement of Rep. Dellums). Almost ten years earlier, a disabled legal scholar and disability rights advocate had written that

> [t]he history of society's formal methods for dealing with handicapped people can be summed up in two words: segregation and inequality. Individuals with handicapping conditions have faced an almost universal conspiracy to shunt them aside from the mainstream of society and to deny them an equal share of benefits and opportunities available to others.... At every juncture, the handicapped person has met with attempts to "push" him or her aside and to

---

on the purported need to protect nonretarded children from them. State laws deemed the retarded "unfit for citizenship."

*Id.* at 462–63, 105 S.Ct. at 3266 (Marshall, J., concurring) (footnotes omitted).

withhold that which is taken for granted from other persons.

Robert L. Burgdorf, Jr., THE LEGAL RIGHTS OF HANDICAPPED PERSONS: CASES, MATERIALS, AND TEXT 51 (1980).

Before passing the ADA, Congress conducted fourteen hearings at the Capitol, and another sixty-three field hearings, and reviewed hundreds of discrimination diaries submitted for the legislative record by persons with disabilities. AMERICANS WITH DISABILITIES ACT OF 1989: HEARINGS ON S. 933 BEFORE THE SENATE COMM. ON LABOR AND HUMAN RESOURCES AND THE SUBCOMM. ON THE HANDICAPPED, 101st Cong., 1st Sess. (1989) (testimony of Justin Dart, Chairman of Task Force on Rights and Empowerment of Americans with Disabilities). Congress was confronted with testimony that

> [b]y almost any definition, Americans with disabilities are uniquely underprivileged and disadvantaged. They are much poorer, much less well educated and have much less social life, have fewer amenities and have a lower level of self-satisfaction than other Americans.

SENATE SUBCOMM. ON THE HANDICAPPED, S. Hrg. 166, pt. 2, at 9 (1987) (statement of Humphrey Taylor); quoted in S.REP. No. 116, 101st Cong., 1st Sess. 8 (1989); also quoted in H.R.REP. No. 485, 101st Cong., 2d Sess., pt. 2, at 31 (1990), U.S.Code Cong. & Admin. News 1990, pp. 267, 313. Congress found that its hearings, investigations, and other sources revealed severe prejudice and discrimination towards disabled persons persisted in this country: Persons with disabilities, especially those with severe, noticeable disabilities, were told outright that they had been excluded because others would feel uncomfortable around them. *See, e.g.,* S.REP. No. 116, 101st Cong., 1st Sess. 7 (1989), and H.R.REP. No. 485, 101st Cong., 2d Sess., pt. 2, at 30 (1990) (a New Jersey zoo keeper refused to admit children with Down's syndrome because he feared they would upset the chimpanzees; and, from remarks of Rep. Vanik, citing as an example of discrimination on the basis of disability from *Alexander v. Choate,* 469 U.S. 287, 307 n. 29, 105 S.Ct. 712, 723 n. 29, 83 L.Ed.2d 661 (1985), a child with cerebral palsy was excluded from public school, although he was academically competitive and his condition was not actually physically disruptive, because his teacher claimed his physical appearance "produced a nauseating effect" on his classmates); 135 CONG.REC. S10720 (daily ed. Sept. 7, 1989) (statement of Sen. Durenberger) (applicant with cerebral palsy described being told she was not qualified for job in metropolitan hospital because fellow employees would not be comfortable working with her); SENATE COMM. ON LABOR AND HUMAN RESOURCES, REP. ON THE AMERICANS WITH DISABILITIES ACT, S.REP. No. 116, 101st Cong., 1st Sess. 7 (1989) (applicant "crippled by arthritis" denied employment in higher education because "college trustees [thought] normal students shouldn't see her"); HOUSE COMM. ON EDUCATION AND LABOR, REP. ON THE AMERICANS WITH DISABILITIES ACT, H.R.REP. No. 485, 101st Cong., 2d Sess., at 42, reprinted in 1990 U.S.CODE CONG. & ADMIN.NEWS 303, 324 (1990) (testimony of Virginia Domini) ("[T]he general public doesn't want to see you doing your laundry, being a case worker, a shopper, or a Mom. It is difficult to see yourself as a valuable member of society, and sometimes it is hard to see yourself as a person worthy of so much more respect than you get from the general public.").

Various draft bills to combat disability discrimination were introduced in 1988, and Congressional hearings followed. H.R. 4498, 100th Cong., 2d Sess., 134 CONG.REC. E1307 (daily ed. April 29, 1988); S. 2345, 100th Cong., 2d Sess., 134 CONG.REC. S5110 (daily ed. April 28, 1988). A revised ADA bill was introduced in the 101st Congress on May 9, 1989. S. 933, 101st Cong., 1st Sess., 135 CONG.REC. S4978 (daily ed. May 9, 1989); H.R. 2273, 101st Cong., 1st Sess., 135 CONG. REC. H1690 (daily ed. May 9, 1989). The House and Senate versions were eventually reported out of committees, the House version was passed on May 22, 1990, by a vote of 403 to 20. 136 CONG.REC. H2638 (daily ed. May 22, 1990). Following conferences on differences between the House and Senate versions, the House approved the final version of the bill by a vote of 377 to 28 on July 12, 1990, 136 CONG.REC. H4629 (daily ed. July 12, 1990), and the following day the Senate

passed the ADA by a vote of 91 to 6. 136 CONG.REC. S9695 (daily ed. July 13, 1990).

In the final form of the ADA, Congress concluded that "[i]ndividuals with disabilities continually encounter various forms of discrimination...." 42 U.S.C. § 12101(a)(5). *Helen L.*, 46 F.3d at 332. In furtherance of the objective of eliminating discrimination against the disabled, Congress stated that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals." 42 U.S.C. § 12101(a)(8); *Helen L.*, 46 F.3d at 332. Thus, the purpose of the ADA is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(a); *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 541 (7th Cir.1995). In his remarks to the more than 3000 people, most of whom had disabilities, gathered on the South Lawn of the White House for the signing ceremony, President Bush described the ADA as an "historic new civil rights Act ...[,] the world's first comprehensive declaration of equality for people with disabilities." President George Bush, Remarks by the President During Ceremony for the Signing of the Americans with Disabilities Act of 1990, 2 (July 26, 1990) (on file with the Harvard Civil Rights–Civil Liberties Law Review), quoted in Robert L. Burgdorf, Jr., *The Americans With Disabilities Act: Analysis And Implications Of A Second–Generation Civil Rights Statute*, 26 Harv. C.R.–C.L.L.Rev. 413 (1991). Although Title I of the ADA, prohibiting discrimination in employment on the basis of a disability, became effective on July 26, 1992, two years after its enactment, Pub.L. 101–336, § 108 ("This title [subchapter] shall become effective 24 months after the date of enactment [July 26, 1990]."), most of Title II became effective only eighteen months following passage of the act, and § 204 of Title II, 42 U.S.C. § 12134, became effective immediately upon passage. Pub.L. 101–336, § 205(a) & (b).

### b. Public Interest Here

 In light of this legislative history, the public interest is served by enforcement of anti-discrimination provisions of Title II of the ADA. Title II extended the nondiscrimination principles of the Rehabilitation Act to state and local governments. *Helen L.*, 46 F.3d at 332. Here, Heather K. has alleged deprivation of services and segregation on the basis of disability. The public interest in eliminating such evils gave rise to the ADA. 42 U.S.C. § 12101(a)(2). That interest will therefore be served here.

### 5. Summary of the Dataphase analysis

The court concludes that, at least on the present record and for the purposes of a TRO, that all four of the factors identified in *Dataphase* weigh in favor of granting Heather K.'s motion for a TRO. As to "irreparable harm," continued open burning poses a very real health threat, possibly even a mortal threat, to Heather K. for which she has no adequate remedy at law. The balance of harms weighs in favor of a TRO, because granting the TRO will harm the City and other interested parties little, if at all, but denying injunctive relief poses a real and immediate threat to Heather K. On the record before the court at this time, it appears that residents of Mallard have other, reasonably convenient means of disposing of waste they might otherwise burn. As to likelihood of success on the merits, Heather K. is a "qualified individual with a disability." 42 U.S.C. § 12131. Further, nothing about her disability prevents her from meeting the "essential eligibility requirements" for receipt of the services, programs, or activities of the City of Mallard, which are only that she be present in the City and seeking to use public facilitates. By reason of her disability, Heather K. has been and continues to be denied "participation in ... the benefits of the services, programs, or activities of" the City of Mallard. 42 U.S.C. § 12132. She is unable to use Mallard's public parks, occupy or travel on public streets or occupy public buildings with open windows or inadequate climate control, she cannot attend public activities or functions held outside, or even play in her own backyard, take walks, or simply be outside if there is any likelihood of open burning taking place. Further, the remedy this court can provide, enjoining an exception

to an existing ban on open burning, is plainly within the power of the court. Finally, as to public interest, the legislative history of the ADA more than adequately demonstrates that the public interest favors elimination of discrimination and segregation by reason of disability caused by action or inaction of a governmental entity. The court therefore turns next to the proper scope of a TRO.

### D. The Requirements Of Fed.R.Civ.P. 65(c) & (d)

#### 1. The Scope Of A TRO

Pursuant to Federal Rule of Civil Procedure 65(d), which requires, *inter alia*, that "every order granting an injunction and every restraining order ... shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained ...," the TRO in this case must specifically sets forth its terms.

■ The proper scope of the TRO in this case must eliminate for the period of the TRO the principle threats to Heather K.'s health. The City has argued that a preparatory period should be allowed before any ban on open burning goes into effect in order to allow citizens to burn accumulated residential wastes. However, it is exactly this burning that poses the immediate threat to Heather K. Thus, any restraint on the exceptions to the City's ban on open burning will take effect immediately. Although a total ban of undetermined duration might impose hardships, the limited duration of a TRO makes any likelihood of hardship from a total ban slight.

■ Thus, the court will enjoin exception 2 of ordinance 105.05, which allowed backyard burning, in its entirety for the duration of the TRO. Exceptions 3 (training fires) and 4 (variances) should be enjoined only to the extent that the City must give notice of any training fires or variances to the plaintiffs in this case so that they may take necessary action to protect Heather from the effects of such burning. Most troubling to the court is the possible overbreadth of enjoining exception 1, which provides for recreational fires, not only because the likelihood of a

threat from such fires seems slightest, but because the court recognizes that the Memorial Day weekend is traditionally the start of summer and the outdoor cooking season in this country. The court construes this exception to pertain only to open fires, *i.e.*, fires not contained in some receptacle, such as campfires, rather than to the ordinary use of outdoor cooking appliances such as charcoal or gas grills, barbecues, or hibachis, and like outdoor cooking fire receptacles. Therefore, the court will enjoin exception 1 concerning recreational fires, as it construes the exception, for the entirety of the duration of the TRO, but with an exception of its own: recreational fires shall be permitted on Sunday, May 28, 1995, and Monday, May 29, 1995, in recognition that these days are holidays.

■ The City has protested that it has no means to advertise or enforce the terms of any TRO the court may impose. Mallard relies on law enforcement by the county sheriff and has very few city employees. Although the court appreciates these problems, they do not relieve the City of the responsibility of attempting to comply with the court's TRO. However, the court will deem the City's efforts to comply with the TRO to have been adequate if it posts notice of the TRO in such public places as are reasonably calculated to give reasonable notice to the citizens of Mallard of the existence and terms of the TRO. The City shall also be required to notify county law enforcement officials of the TRO and request reasonable assistance from such officials in enforcing its terms.

#### 2. Fed.R.Civ.P. 65(c)'s Security Requirement

Finally, the court turns to the question of the bond requirement found in *Fed.R.Civ.P.* 65(c). That rule provides, in pertinent part:

No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant. . . .

*Fed.R.Civ.P.* 65(c). On its face the rule admits of no exceptions, and in fact some courts have held that the requirement is mandatory. *See, e.g., Gateway Eastern Ry. Co. v. Terminal R.R. St. Louis*, 35 F.3d 1134, 1141 (7th Cir.1994) (discretion only in determining the amount of the bond to be posted); *Contin-*

*uum Co., Inc. v. Incepts, Inc.,* 873 F.2d 801, 803 (5th Cir.1989) (*"Fed.R.Civ.P.* 65(c) provides that a bond must be posted before a federal court may issue an interlocutory injunction," and "failure to require the posting of a bond or other security constitutes grounds for reversal of the injunction"). This court recently discussed the bond requirement extensively in *Curtis 1000, Inc. v. Youngblade,* 878 F.Supp. 1224, 1275–1280 (N.D.Iowa 1995).

■ Although the court believes that a bond should usually be required, the court believes that this case presents the extremely rare situation in which the bond requirement should be waived. Heather K. argues that the court's grant of leave to prosecute this matter *in forma pauperis* is sufficient ground to waive the security requirement. However, even where the plaintiffs are indigent, a careful weighing of the equities is still required before the bond requirement can be waived. *Temple Univ. v. White,* 941 F.2d 201, 219 (3d Cir.1991), *cert. denied sub nom. Snider v. Temple Univ.,* 502 U.S. 1032, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992).

■ In this case, there is virtually no possibility of a risk of financial harm to the party to be enjoined. *Hoxworth v. Blinder, Robinson & Co.,* 903 F.2d 186, 210 (3d Cir. 1990); *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 803–05 & n. 8 (3d Cir.1989). Thus, there appears to be little or no need to provide for compensation of an incorrectly enjoined defendant who may suffer from the effects of an incorrect interlocutory order. *National Kidney Patients Assoc. v. Sullivan,* 958 F.2d 1127, 1134 (D.C.Cir.1992). In the absence of a dictate from the Eighth Circuit Court of Appeals that a bond is mandatory, *see Rathmann–Group v. Tanenbaum,* 889 F.2d 787, 789 (8th Cir.1989),[20] the court feels justified in waiving the bond requirement in this case. No

security shall be required for issuance of the TRO in this case.

**IT IS THEREFORE ORDERED** that plaintiff's motion to proceed in this matter under a pseudonym is **granted.** Plaintiff's affidavit signed by her mother is hereby sealed and all parties herein shall take all reasonable steps to shield plaintiff's true identity.

**IT IS FURTHER ORDERED** that plaintiff's motion for a temporary restraining order is **granted** as stated in the following **TEMPORARY RESTRAINING ORDER.** No bond or security shall be required for the issuance of said temporary restraining order.

**IT IS SO ORDERED.**

## TEMPORARY RESTRAINING ORDER

**WHEREAS,** pursuant to *Fed.R.Civ.P.* 65(b), the court finds that the exceptions to the ban on open burning found in Ordinance 105.05 of the City of Mallard pose a threat of irreparable harm to the life and health of plaintiff Heather K. in violation of Title II of the Americans With Disabilities Act, 42 U.S.C. § 12131 *et seq.,* the following sections of City of Mallard Ordinance 105.05 are, for the ten days following issuance of this order, **hereby temporarily restrained and enjoined** upon the terms stated.

1. Ordinance 105.05, subparagraph 1., which permits "recreational fires" defined as

 [o]pen fires for cooking, heating, recreation and ceremonies, provided they comply with the limits for emissions of visible air contaminants established by the State Department of Natural Resources ...

 is **temporarily restrained and enjoined,** with the exception that recreational fires pursuant to this subparagraph shall be

**20.** In *Rathmann–Group v. Tanenbaum,* 889 F.2d 787 (8th Cir.1989), the appellate court determined that the district court abused its discretion by not requiring a bond in addition to the $10,-000 already posted on the issuance and continuation of a TRO, which can be read to mean that the bond for a preliminary injunction was mandatory even where a previous bond for a TRO was in place. *Id.* at 789. However, the court cited as support for its decision to remand, *Roth*

*v. Bank of the Commonwealth,* 583 F.2d 527, 539 (6th Cir.1978), which found error, according to the *Rathmann–Group* court, "not because [the] trial court failed to require a bond in any particular amount, but because [the] court failed to exercise discretion required by Rule 65(c) by expressly considering [the] question of requiring [a] bond," *Id.,* which suggests that whether or not a bond is required is in the discretion of the court.

permitted on Sunday, May 28, 1995, and Monday, May 29, 1995, in observance of the National Holiday of Memorial Day. Nothing in this court's order shall be construed as restraining or enjoining the ordinary use of outdoor cooking appliances such as charcoal or gas grills, barbecues, or hibachis, and like outdoor cooking fire receptacles at any time during the effective period of this temporary restraining order.

2. Ordinance 105.05, subparagraph 2., which permits "backyard burning, defined as

 [b]ack yard burning of residential waste at dwellings of four-family units or less . . .

is **temporarily restrained and enjoined** in its entirety for the duration of this temporary restraining order.

3. Ordinance 105.05, subparagraph 3., which permits "training fires," defined as

 [f]ires set for the purpose of bona fide training of public or industrial employees in fire fighting methods, provided that the Executive Director receives notice in writing at least one week before such action commences . . .

is **temporarily restrained and enjoined** only to the extent that the City of Mallard shall provide notice by personal service to plaintiffs herein of the occurrence of any such training fires not less than 24 hours before any such fires are scheduled to commence.

4. Ordinance 105.05, subparagraph 4., which permits any "variance" in the following terms:

 Any person wishing to conduct open burning of materials not permitted herein may make application for a variance to the Executive Director . . .

is **temporarily restrained and enjoined** only to the extent that the City of Mallard shall provide notice by personal service to plaintiffs herein of the occurrence of any such variance fires not less than 24 hours before any such fires are scheduled to commence.

This temporary restraining order shall be binding upon the parties to this action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order.

The City of Mallard, Iowa, shall provide notice of this temporary restraining order by posting notice copies of this temporary restraining order in such public places as are reasonably calculated to give reasonable notice to the citizens of Mallard of the existence and terms of the temporary restraining order not later than 24 hours following the date and time on which this order is signed and filed with the Clerk of Court for the Northern District of Iowa.

**IT IS SO ORDERED.**