896 F.Supp. 1468 (1995)
TERRA INTERNATIONAL, INC., a Delaware corporation, Plaintiff,
v.
MISSISSIPPI CHEMICAL CORPORATION, a Mississippi corporation, Defendant.
No. C 95-4088.
United States District Court, N.D. Iowa, Western Division.
September 5, 1995.
*1469 George Zelcs of Clausen Miller, P.C., Chicago, IL, Jonathan Jay of Zelle & Larson, Dallas, TX, Gregg Williams of Heidman, Redmond, Fredregill, Patterson, Schatz & Plaza, L.L.P., Sioux City, IA, George Valentine, General Counsel and Ryan Crane, Sioux City, IA, for Terra Intern., Inc.
Steve Eckley and Randy Duncan of Duncan, Green, Brown, Langeness & Eckley, P.C., Des Moines, IA, Bill Smith of Brunini, Grantham, Grower & Hewes, P.L.L.C., of Jackson, MS, and Jay Borgfeld, General Counsel, Jackson, MS, for Mississippi Chemical Corp.
MEMORANDUM OPINION AND ORDER REGARDING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER
BENNETT, District Judge.
This diversity litigation arises from the catastrophic explosion of a fertilizer plant in northwest Iowa on December 13, 1994, in which four persons were killed, eighteen were injured, and the fertilizer plant sustained enormous damage. Plaintiff here, the owner and operator of the fertilizer plant, has brought suit against the designer and licensor of its ammonium nitrate neutralizer alleging negligence and strict liability causes of action to recover damages resulting from the explosion. Plaintiff has moved to enjoin the prosecution of parallel litigation that has been filed by the defendant in federal court in Mississippi.

I. INTRODUCTION AND BACKGROUND
This lawsuit, filed on August 31, 1995, at 12:35 p.m., arises from the explosion of plaintiff Terra International's fertilizer plant in Port Neal, Iowa, on December 13, 1994. The Port Neal facility is located approximately eight miles south of Sioux City, but the explosion rattled windows and shook the ground throughout Sioux City. In the explosion, four persons were killed, eighteen were injured, and the Terra plant sustained substantial damage.[1] The explosion left a huge crater at the ammonium nitrate plant portion of the Terra facility and much of the rest of the facility was leveled. Terra's Port Neal facility has not operated since the explosion and Terra officials estimate that the losses resulting from the explosion will exceed $200 million.
Apart from the massive search and rescue operations initiated immediately after the explosion, the destruction of the Port Neal facility has engendered extensive investigation. Terra formed its own Investigation Committee comprised of outside consultants and internal personnel, and the Iowa Occupational Safety and Health Administration (IOSHA) *1470 also conducted an extensive investigation over several months, as did the State Fire Marshal. Evidence from the blast has been collected, catalogued, and stored in a secure warehouse, known as the "Evidence Warehouse," near Sioux City. Terra has produced a report on the explosion laying most of the blame for the incident at MCC's door.
Terra, the plaintiff in this lawsuit, is a Delaware corporation with its principal place of business in Sioux City, Iowa. Defendant Mississippi Chemical Corporation (MCC), is a Mississippi corporation with its principal place of business in Yazoo City, Mississippi. MCC is a manufacturer and distributor of chemical fertilizer products. For the last several decades, MCC has also developed and licensed fertilizer manufacturing technology for use by customers worldwide. The complaint in this matter alleges that MCC is recognized as an industry leader in the design of ammonium nitrate neutralization processes and equipment and that Terra received a license from MCC to build such a neutralizer in its Port Neal plant. MCC allegedly provides engineering services related to the installation, start-up technical instruction and guidance, maintenance, and inspection services for licensed facilities worldwide and provided such services to Terra for the Port Neal plant.
Count I of the present lawsuit, a negligence cause of action, alleges that MCC breached a duty of care and caution in designing the MCC technology for use by Terra, and in providing guidance and services to ensure that the technology would be reasonably safe.[2] Count II alleges strict liability of *1471 MCC on the grounds that the design of the MCC technology was unreasonably dangerous and defective, that these conditions were unknown to Terra, and that these conditions were the proximate cause of the December 13, 1994, explosion.[3] On both counts, Terra seeks damages in an unspecified amount in excess of $50,000, an award of all costs, prejudgment and postjudgment interest, and such other and further relief as the court may deem just and proper. Jurisdiction in this lawsuit is founded on diversity of citizenship of the parties pursuant to 28 U.S.C. § 1332, and venue is alleged under 28 U.S.C. § 1391(a) and (c) in that a substantial part of the events or omissions giving rise to the claims occurred in Woodbury County, Iowa, or a substantial part of the property that is the subject of this action is situated in this judicial district, and the defendant is subject to personal jurisdiction and/or resides in this judicial district.
Before filing the present lawsuit, Terra provided a courtesy copy of its complaint to MCC by sending it Federal Express on August 30, 1995, for next morning delivery. As the court noted above, this lawsuit was filed on August 31, 1995, at 12:35 p.m. Later that same afternoon, MCC also filed suit against Terra in the United States District Court for the Southern District of Mississippi, Western Division. In MCC's lawsuit, Mississippi Chem. Corp. v. Terra Int'l, Inc., No. 5:95CV127 (S.D.Miss.), in Count I, MCC seeks declaratory relief that MCC "did not defectively design the neutralizer [at the center of the Port Neal explosion] ... and is not liable to Terra for damages arising from the explosion under any theory of recovery."[4] *1472 In Count II, MCC seeks damages, alleging that Terra's incident investigation committee report, a July 17, 1995, press release, and an address given by Mark Rosenbury, a Terra vice president, were defamatory of MCC.[5] MCC alleges significant loss of business as the result of Terra's allegedly defamatory communications.
As the result of the filing of MCC's lawsuit in Mississippi, Terra has moved for an emergency temporary restraining order (TRO) in this court to enjoin the prosecution of the litigation between the parties brought by MCC in the Mississippi federal court. The court was notified of Terra's intent to file such a request by telephone on September 1, *1473 1995, and set hearing in this matter for September 5, 1995. The court received the written request for a TRO on Labor Day, September 4, 1995. Also on Labor Day, the court held extensive discussions with counsel for both parties by telephone conference call including a preliminary discussion of the merits of Terra's application for a TRO, or at least identification of the parties' relative positions concerning such a TRO, and matters concerning the scheduling of a hearing on the TRO.[6] During these discussions, it appeared that the parties might agree to entry of a TRO by consent. However, at the hearing on Terra's application for a TRO on September 5, 1995, the parties indicated that they could not agree to a TRO by consent. Therefore, Terra once again asserted its desire for the court to rule on its application for a TRO.
The court held the hearing on Terra's application for a TRO on September 5, 1995, at 12:43 p.m. All parties appeared by telephone. Terra was represented by counsel George Zelcs of Clausen Miller, P.C., in Chicago, Illinois, and Jonathan Jay of Zelle & Larson, in Dallas, Texas, and by local counsel local counsel Gregg Williams of Heidman, Redmond, Fredregill, Patterson, Schatz & Plaza, L.L.P., in Sioux City, Iowa. Also present on behalf of Terra were George Valentine, General Counsel for Terra, and Ryan Crane. MCC was represented by its local counsel, Steve Eckley and Randy Duncan of Duncan, Green, Brown, Langeness & Eckley, P.C., in Des Moines, Iowa, and by Jay Borgfeld, General Counsel for MCC, and attorney Bill Smith, both of Jackson, Mississippi. The court has appreciated the professionalism of all counsel in preparing this matter for hearing.

II. LEGAL ANALYSIS

A. Terra's Application For A Temporary Restraining Order
Rule 65 of the Federal Rules of Civil Procedure provides for temporary restraining orders and preliminary injunctions as follows:
Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.
Fed.R.Civ.P. 65(d).[7] Ordinarily, the grant or denial of a temporary restraining order or preliminary injunction in this circuit is determined upon consideration of the factors stated in Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 113 (8th Cir.1981) (en banc).[8] However, the Eighth Circuit Court of Appeals has held that when considering the merits of the sort of TRO or injunction involved here, "i.e., orders enjoining a party from proceeding with a duplicative, second-filed lawsuit in another forum," such TROs or preliminary injunctions "are not subject to the Dataphase standards for injunctive relief." Northwest Airlines, Inc. v. American Airlines, Inc., 989 F.2d 1002, 1004 (8th Cir. 1993) (emphasis added); see also Boatmen's *1474 First Nat'l Bank of Kansas City v. Kansas Pub. Employees Retirement Sys., 57 F.3d 638, 641 (8th Cir.1995) (citing Northwest Airlines). The court in Northwest Airlines reasoned as follows:
In a case of this kind, the Dataphase factors are inapposite, since the question has nothing to do with the merits of the underlying controversy and is simply whether, as between two courts both having jurisdiction over the parties and the subject matter of the dispute, the court in which jurisdiction first attached should proceed to adjudicate the controversy and should restrain the parties from proceeding with the later-filed action. In this context, the governing standards are those set forth by this Court in United States Fire Insurance Co. v. Goodyear Tire & Rubber Co., 920 F.2d 487, 488-89 (8th Cir.1990)[.]
Northwest Airlines, 989 F.2d at 1004; Boatmen's First Nat'l Bank, 57 F.3d at 641 (quoting Northwest Airlines). The Goodyear Tire decision, which therefore articulates the applicable standards for determination of this motion, states what is generally known as the "first-filed rule":
The well-established rule is that in cases of concurrent jurisdiction, "the first court in which jurisdiction attaches has priority to consider the case." Orthmann v. Apple River Campground, Inc., 765 F.2d 119, 121 (8th Cir.1985). This first-filed rule "is not intended to be rigid, mechanical, or inflexible," Orthmann, 765 F.2d at 121, but is to be applied in a manner best serving the interests of justice. The prevailing standard is that "in the absence of compelling circumstances," Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Haydu, 675 F.2d 1169, 1174 (11th Cir.1982), the first-filed rule should apply.
Goodyear Tire, 920 F.2d at 488-89; see also Boatmen's First Nat'l Bank, 57 F.3d at 641 (identifying these standards from Northwest Airlines); Northwest Airlines, 989 F.2d at 1005 (quoting Goodyear Tire); E.E.O.C. v. University of Pa, 850 F.2d 969 (3d Cir.1988), aff'd on other grounds, 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Haydu, 675 F.2d 1169, 1174 (11th Cir.1982); West Gulf Maritime Assoc. v. ILA Deep Sea Local 24, 751 F.2d 721, 730 (5th Cir.1985); Mann Mfg., Inc. v. Hortex, Inc., 439 F.2d 403, 407 (5th Cir.1971); William Gluckin & Co. v. Int'l Playtex Corp., 407 F.2d 177, 178 (2d Cir.1969). The "first-filed rule" has the benefit of being a
relatively firm rule that, while providing for the exceptional case, avoids in the main the need for ad hoc balancing of innumerable factors on a case-by-case basis [and therefore] is both more predictable for litigants  yielding more speedy, less expensive adjudication  and more easily applied by the courts  preserving scarce judicial resources. These are proper considerations that are consistent with the interests of justice.
Berisford Capital Corp. v. Central States, Southeast & Southwest Areas Pension Fund, 677 F.Supp. 220 (S.D.N.Y.1988). The Eighth Circuit Court of Appeals in Northwest Airlines described the purpose of the first-filed rule more succinctly as "conserv[ing] judicial resources and avoid[ing] conflicting rulings." Northwest Airlines, 989 F.2d at 1006. Thus, "the first filed rule gives priority, for purposes of choosing among possible venues when parallel litigation has been instituted in separate courts, to the party who first established jurisdiction." Id. (citing Goodyear Tire, 920 F.2d at 488).
The court in Northwest Airlines identified a number of circumstances the district court should consider to determine whether a departure from rigid application of the first-filed rule is appropriate in a particular case, and hence whether the parallel litigation should be enjoined. Northwest Airlines, 989 F.2d at 1006-1007. The first "red flag" identified by the court is whether the first-filer had notice of the second-filer's intention to file suit, and therefore raced to the court-house to be first. Id. at 1007. Thus, the court must look at the relative timing of the actions and any delay by either party to see if the second-filed lawsuit was "not truly contemplated" until after the first-filed action was conceived. Id. The second "red flag" is whether the first-filed action is merely for declaratory judgment, suggesting that it is a "preemptive strike," rather than a suit for *1475 damages or equitable relief. Id. Additional factors considered by the court were the convenience of the form to the parties and witnesses, whether there are claims stated in one of the lawsuits not also presented in the other, the likelihood of undue burden to the plaintiff in the enjoined lawsuit of litigating instead in the venue of the first-filed lawsuit, and the likelihood of fairness and impartiality of the district court in the venue of the first-filed action. Id. The court summarized the analysis of the case before it as presenting the "spectre of duplicative efforts and costs and of inconvenience to the parties, together with the waste of judicial resources inherent in parallel litigation," such that the district court's decision to enjoin the second-filed action was entirely appropriate. Id.; see also Boatmen's First Nat'l Bank, 57 F.3d at 641 (identifying these factors in the court's analysis in Northwest Airlines as applicable to determination of an application to enjoin parallel litigation, but finding the district court had made insufficient findings of fact and conclusions of law to support the injunction).[9] The court's application of these standards for enjoining a parallel action is reviewed for abuse of discretion. Northwest Airlines, 989 F.2d at 1005. In applying these standards, however, the court is mindful that its determination is necessarily preliminary, involving only an application for an emergency TRO, and is based upon only the limited briefing and argument time allowed the parties. Nothing in the court's determination of issues presented in such preliminary form is intended to be treated by the parties as a definitive decision on that issue and is subject to further consideration in further proceedings.
Thus, turning to a preliminary consideration of the factors identified in Northwest Airlines, the court finds first that, unlike the Northwest Airlines case, the two lawsuits have been filed in very close proximity rather than weeks apart. Northwest Airlines, 989 F.2d at 1007. However, it has been apparent to all parties since the explosion on December 13, 1994, or at least since investigations early this year as to the cause of the explosion, that litigation of the sort brought here was likely to be brought by Terra, and the sole question was when. Consequently, nothing should have suggested to MCC that the issues raised in this litigation were resolved without litigation instituted by Terra. Id. In these circumstances, at least at the TRO posture of the proceedings, the court believes that the timing of the filing of the two lawsuits might suggest that MCC, not Terra, is jockeying for a preferred forum. Although MCC may have contemplated its own lawsuit for defamation independently of Terra's, and MCC has asserted that the forum selection clause in its licensing agreement with Terra will ultimately require that all litigation proceed in Mississippi. MCC certainly had notice of the likelihood of Terra's lawsuit and should not be accorded any relief from a TRO on the ground that Terra won the race to the courthouse by inches. Although the first "red flag" identified in Northwest Airlines may be waving, it does not signal the failure of Terra's application for a TRO.
Furthermore, the first-filer here, Terra, has not brought a lawsuit that is merely a "preemptive strike." Id. Terra's suit is not for declaratory judgment, and therefore suggestive of merely jockeying for the better *1476 forum, but a lawsuit for damages placing the facts and merits of all claims between the parties arising from the December 13, 1994, explosion at issue in this litigation. Id. By contrast, although MCC has included in its complaint a claim of defamation, the first count of its complaint is for declaratory judgment which would effectively preclude Terra's claims based on defects and breaches of duty for which Terra seeks to hold MCC liable. MCC's lawsuit therefore has the appearance of a preemptive strike even though married to its declaratory judgment claim is another claim for damages resulting from defamation. However, before leaving these issues of the relationship between the present litigation and the litigation sought to be enjoined, because the lawsuits are not in all respects "obverses" of each other or exact parallels, the court believes it proper to consider what is meant by "parallel litigation" falling within the first-filed rule.
In defining "parallel litigation" within the context of the "first-filed rule," courts have held that a district court has the power to enjoin proceedings involving the same parties and the same issues brought in another forum. Horn & Hardart Co. v. Burger King Corp., 476 F.Supp. 1058, 1059 (S.D.N.Y.1979); see also Applexion S.A. v. Amalgamated Sugar Co., No. 95-C-858, 1995 WL 404843, at *2 (N.D.Ill. July 7, 1995). To determine whether the same issues are present in the two lawsuits in question, the court should not necessarily require a precise identity of issues. Horn & Hardart Co., 476 F.Supp. at 1059. Rather, the focus of the inquiry should be whether there is a danger of inconsistent results and a duplication of judicial proceedings. Id. In Horn & Hardart Co. v. Burger King Corp., the court found the issues in the two lawsuits to be the same for purposes of enjoining the second lawsuit. Id. at 1059-60. In the first-filed lawsuit, the complaint alleged that the defendants had engaged in unreasonable restraints of trade. Id. One of the restraints that the plaintiff specifically claimed as unreasonable was also the subject matter of one of the injunctions the defendant sought in its complaint in the second lawsuit. Id. at 1060. Furthermore, the court recognized that the relief requested in the two complaints made it clear that the defendant was seeking to enforce against the plaintiff the exact restraints which the plaintiff's complaint had alleged were unreasonable. Id. The court observed that the question of the relationship between the two lawsuits, for purposes of applying the first-filed rule, does not make identity of issues "talismanic," but is a more "practical question" of "whether there is a danger of inconsistency of result and duplication of judicial effort." Id. at 1060 n. 5.
Similarly, in Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co., 189 F.2d 31 (3d Cir.1951), aff'd, 342 U.S. 180, 72 S.Ct. 219, 96 L.Ed. 200 (1952), the court interpreted the focus of the "first-filed rule" to be the substance of the conflicting suits, particularly answering the question of whether the outcome of both suits rests on the same range of legal and factual questions. Id. at 34 (finding the same issues exist where the first complaint sought damages for patent infringement and the second complaint sought a declaratory judgment that the patents were invalid). Therefore, even if the specific legal theories in each complaint are different, a legal and factual nexus between the two complaints will suffice to meet the "same issues" requirement under the "first-filed rule." Id. The Kerotest court therefore focused on the triable substance of the conflicting suits, not how the claims were stated. Id.
For additional examples of decisions in which courts enjoined the litigation of the "same issues" in a second lawsuit, see, e.g., Northwest Airlines, 989 F.2d at 1003-04 (same issues exist where the first complaint sought declaratory judgment that Northwest had lawfully hired at-will employees of American Airlines previously and the second complaint sought a permanent injunction and damages for unfair competition and tortious interference with contractual relationships); Asset Allocation & Mgt. Co. v. Western Employers Ins. Co., 892 F.2d 566 (7th Cir.1989) (enjoining fraud action against investment advisor by insurer, even though not harassing, in favor of parallel suit by investment advisor for breach of the investment advisor's contract on ground that fraud action could be a counterclaim to contract action); Decker Coal Co. v. Commonwealth Edison *1477 Co., 805 F.2d 834 (9th Cir.1986) (court of first-filed action, alleging breach of contract, could enjoin later-filed action, for declaratory judgment that it had properly invoked clauses of the contract as grounds for non-performance, because claims involved same parties, same contract, and same issues); Roth v. Bank of the Commonwealth, 583 F.2d 527 (6th Cir.1978) (court could enjoin bank from filing suit to collect on promissory notes in action filed first by persons obligated by those notes alleging securities fraud by the bank); Columbia Plaza Corp. v. Security Nat'l Bank, 525 F.2d 620, 173 U.S.App.D.C. 403 (1975) (same issues where first complaint involved property owners' suit against banks and the second complaint involved the same banks' suit to recover on notes executed in connection with the construction project at issue in the first suit); Applexion S.A., No. 95-C-858, 1995 WL 404843, at *3 (finding the same issues exist in two lawsuits where the same patent is the subject matter of both complaints, even though the complaints involve the patent processes at different facilities); Marquest Medical Prods., Inc. v. McKinnon, 864 F.Supp. 154, 156 (D.Colo. 1993) (finding the same issues exist in two lawsuits where the first complaint alleged breach of fiduciary duty and sought declaratory judgment that a consulting agreement was void, and the second complaint involved claims for payment pursuant to the same consulting agreement); Rohm and Haas Co. v. Brotech Corp., 770 F.Supp. 928, 929 (D.Del.1991) (same issues exist where the first complaint alleges patent infringement and the second complaint alleges antitrust, RICO, and common-law fraud claims arising out of the same alleged pattern of fraud on the Patent and Trademark Office).
From these precedents, it follows that the two lawsuits here involve issues, factual and legal, sufficiently related to each other to bring them within the first-filed rule. MCC's declaratory judgment claim involves issues very closely related to those presented in Terra's complaint. Even determination of the MCC's defamation claim would require the Mississippi court to adjudicate a number of issues involved in this litigation, including the cause of the explosion at the Port Neal facility and the alleged defectiveness of MCC's design and performance of its duties. Both lawsuits will require the respective courts to consider similar issues and each decision would have, at least potentially, some preclusive effect in the other lawsuit.
Furthermore, comparison of the nature of Terra's lawsuit, which is for damages, with that of MCC, which is for declaratory judgment coupled with a claim that appears to raise similar factual and legal issues, suggests that the second of the "red flags" identified by the Eighth Circuit Court of Appeals in Northwest Airlines, that the present litigation is merely a "preemptive strike," is not raised here. Northwest Airlines, 989 F.2d at 1006. Who may have precipitated the race to the courthouse is not altogether clear, but it is apparent, again at the present posture of the proceedings, that there is no evidence that Terra acted in bad faith in filing this kind of lawsuit in this district at this time. Id. Whether intentionally or not, MCC's litigation could have preclusive or res judicata effect in the present litigation and in the other lawsuits against MCC filed in this district.[10] The preclusive effect of the parallel litigation is a legitimate concern of the court in determining whether and to what extent to enjoin prosecution of the Mississippi litigation. See Northwest Airlines, 989 F.2d at 1006, and that concern here weighs in favor of enjoining the Mississippi litigation to some extent, at least temporarily.
As to additional considerations suggested by the Northwest Airlines decision, on the face of the pleadings it appears that venue in this district is entirely proper. Id. The damaged property and many of the witnesses and victims of the accident reside within or near this district, and the evidence collected and stored in the "Evidence Warehouse" is readily accessible here. Because MCC has *1478 undertaken an extensive and continuing relationship with Terra for many years involving what appears to have been a great deal of contact by MCC personnel with the Port Neal plant, and because MCC conducts such customer relations worldwide, the court does not believe, on the basis of the record currently before it, that compelling such a worldwide company to conduct litigation in the Northern District of Iowa will impose an undue burden upon it. Id. Furthermore, the court has every confidence that it will be able to consider the merits of any litigation between these parties fairly and impartially. Id.
Thus, on the face of the pleadings and upon the showings made in support of the application for an emergency TRO, it appears that there is an odious "spectre of duplicative efforts and costs and of inconvenience to the parties, together with the waste of judicial resources inherent in parallel litigation," supporting some kind of injunction of any other litigation involving these two parties arising from the December 13, 1994, explosion. Id. Terra's application for a temporary restraining order restraining MCC from prosecuting litigation against Terra for claims arising from the December 13, 1994, explosion will therefore be granted to some extent. The precise extent appropriate in the circumstances, however, is yet to be determined.
Although the Eighth Circuit Court of Appeals has held that the Dataphase factors are not applicable to the determination of whether this court should enjoin parallel litigation in another forum, Northwest Airlines, 989 F.2d at 1004, this court does not believe that all of the Dataphase factors are wholly inapplicable in the present circumstances. The court in Northwest Airlines specifically identified the "success on the merits" factor as inapplicable, because the merits of the respective lawsuits are simply not at issue when determining whether one lawsuit or the other should be enjoined, id., and this court, of course, agrees. However, because issuance of a TRO is done pursuant to the court's equitable power, the court believes that some additional weighing of equities identified in Dataphase is appropriate. The court finds that the Dataphase factors that may still be relevant to the present application for a TRO are the threat of irreparable harm to Terra, the balance of the harms between the parties and other interested parties, and the public interest. See, e.g., Goff v. Harper, 60 F.3d 518, 520 (8th Cir.1995) (listing these among Dataphase factors); Kirkeby v. Furness, 52 F.3d 772, 774 (8th Cir.1995) (same); Pottgen v. Missouri State High Sch. Activities Ass'n, 40 F.3d 926, 929 (8th Cir.1994) (same).
One factor in the Dataphase analysis the court believes is still pertinent here is the "threat of irreparable harm to the movant absent the injunction." Pottgen, 40 F.3d at 929. Terra asserts that it may suffer irreparable harm, because MCC's suit in Mississippi will not address all of its claims. However, such an assertion disregards Terra's ability to seek relief on its own claims as counterclaims in the Mississippi litigation, which suggests that Terra has an adequate remedy at law. Baker Elec. Co-op, Inc. v. Chaske, 28 F.3d 1466, 1473 (8th Cir.1994) (sufficient showing on this factor can be made, for example, by showing that the movant has no adequate remedy at law). However, the fact that Terra may assert a valid damages claim in the MCC lawsuit in Mississippi does not necessarily preclude issuance of a preliminary injunction, because damages relief may not fully compensate the movant for being denied its rights. Glenwood Bridge, Inc. v. City of Minneapolis, 940 F.2d 367, 371-72 (8th Cir.1991). This is so, because, even when money damages are available to compensate for some of the harm to the plaintiff, other less intangible injuries cannot be so easily valuated or compensated. Id. Here, even though Terra can raise its claims in the Mississippi lawsuit, the threat of irreparable harm to Terra is the potential of the preclusive effect of a decision in the Mississippi lawsuit in a forum that does not, in the first instance, entertain Terra's claims and in which the potential for less convenient access to witnesses and evidence could be prejudicial to Terra's interests.
The "balance of harm" factor is "the balance between the harm and the injury that the injunction's issuance would inflict on other interested parties, and the public interest." *1479 Pottgen, 40 F.3d at 929. It is not identical to the "irreparable harm" analysis. Irreparable harm focuses on the harm or potential harm to the plaintiff of the defendant's conduct or threatened conduct. Dataphase, 640 F.2d at 114. In contrast, the balance of harm analysis examines the harm of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties, including the public, as well. Id.; see also Glenwood Bridge, 940 F.2d at 372 (considering the effect of granting or denying the injunction on the public's interest in a public works construction project as well as upon the parties in the balance of harm analysis); Modern Computer Sys., Inc. v. Modern Banking Sys., Inc., 871 F.2d 734, 737-38 (8th Cir.1989) (en banc) (harm to other interested parties also considered). To determine what must be weighed, the court finds that courts of this circuit have looked at the threat to each of the parties' rights that would result from granting or denying the injunction. Baker Elec. Co-op, 28 F.3d at 1473. Here, there is no evident threat to MCC's rights if the TRO is properly tailored to allow MCC to go forward with its own lawsuit subject only to the requirement that it not attempt, in that litigation, to enjoin in any way the prosecution of Terra's lawsuit in this district. MCC's rights would be further protected if nothing in the TRO issued by this court precludes it from moving to transfer the Terra lawsuit from this district to Mississippi. Similarly, Terra should not be precluded by an over broad injunction that might bar it from moving to transfer the Mississippi litigation to this district. Terra also asserts that it will suffer hardship as the result of litigating in Mississippi. Although the court is not entirely convinced that Terra will suffer hardship, it might indeed suffer a prejudicial deprivation of witnesses readily available in Iowa, but more difficult to compel to appear in Mississippi.
The final factor in the Dataphase analysis is the impact of granting or denying the preliminary injunction upon the public interest. Pottgen, 40 F.3d at 929. The "public interest" factor frequently invites the court to indulge in broad observations about conduct that is generally recognizable as costly or injurious.[11] However, the public interest here is more readily apparent in the filing, in this district, of other lawsuits involving MCC, and potentially Terra, also arising from the December 13, 1994, explosion. Certainly, there will be economies to the public interest if parallel discovery can be administered from this court through consolidation of all discovery concerning cases arising from the explosion under the aegis of this court. Furthermore, the location of the largest part of the physical evidence and the body of witnesses in this district suggests that the public interest will be served if MCC is enjoined from attempting to stay this litigation in this forum. Thus, the equitable Dataphase factors this court finds applicable also weigh in favor of a properly limited TRO.
The court recognizes that it may be appropriate, ultimately, upon consideration of the merits of a preliminary or permanent injunction, or upon a motion for transfer, consolidation, or dismissal, for more thorough consideration to be made of the relationship between the two lawsuits and the economies to be gained by pursuing them in a single forum. The parties have intimated to the court that motions for transfer or dismissal of each lawsuit in favor of the other are contemplated or have been filed in each case. At the time the court considers such a motion in this case, the implications of applying the "first-filed rule" may require substantial further analysis. See, e.g., Brower v. Flint Ink Corp., 865 F.Supp. 564, 567-73 (N.D.Iowa 1994) (motion to dismiss second-filed action in favor of first-filed action). The court has no intention of depriving the parties of a full and fair opportunity to brief and argue any issues relevant to ultimate resolution of what is the proper forum for the litigation between *1480 the parties.[12] However, the court is presented here with a request for a TRO, a very preliminary proceeding, which anticipates further review by the court. See Fed. R.Civ.P. 65(b). In light of the further opportunity for review of this preliminary ruling, the court has no hesitation in granting Terra's application for a TRO, at least to some specifically tailored extent.

B. The Requirements Of Fed.R.Civ.P. 65(c) & (d)
Because the court has concluded that Terra's application for a TRO should be granted, the court must also consider both the appropriate scope of the TRO and what security Terra must offer before the TRO shall issue.

1. The Scope Of A TRO
Pursuant to Federal Rule of Civil Procedure 65(d), which requires, inter alia, that "every order granting an injunction and every restraining order ... shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained ...," the TRO in this case must specifically sets forth its terms. Although Terra seeks a broad injunction against prosecution of the Mississippi lawsuit, this court is of the view that a properly tailored TRO should be much narrower.
In order to protect the status quo, at these preliminary stages of the proceedings, the court need only enjoin MCC from attempting in its turn to enjoin prosecution of Terra's lawsuit in this district. Thus, the court will enjoin MCC from seeking an injunction or restraining order in the Mississippi litigation or any other litigation MCC might file in Mississippi or elsewhere enjoining in any way the present lawsuit between the parties in the United States District Court for the Northern District of Iowa. However, this TRO shall have no effect on discovery or on the parties' ability to file motions to transfer or dismiss, or on any other action in either lawsuit.
The court conferred with the parties as to the proper duration of any TRO it might issue. Upon consideration of the parties' desires to resolve the issue of which court should properly hear each or all lawsuits, and the need to argue these matters adequately, the court concludes that the TRO shall last, in the first instance, for the period of 120 days. Sixty days from the date of this order, the parties shall file motions to transfer or dismiss, or for permanent injunctions, as they deem appropriate. The parties shall thereafter have twenty-one days within which to respond to any motions filed by their opponent, and an additional seven days within which to file any reply briefs. The court will endeavor to hear the pending motions approximately ninety days from the date of this order and to render its decision within the duration of the TRO.

2. Fed.R.Civ.P. 65(c)'s Security Requirement
Finally, the court turns to the question of the bond requirement found in Fed.R.Civ.P. 65(c). That rule provides, in pertinent part, that "no restraining order or preliminary injunction shall issue except upon the giving of security by the applicant." Fed.R.Civ.P. 65(c). On its face the rule admits of no exceptions, and in fact some courts have held that the requirement is mandatory. See, e.g., Gateway Eastern Ry. Co. v. Terminal R.R. St. Louis, 35 F.3d 1134, 1141 (7th Cir.1994) (discretion only in determining the amount of the bond to be posted); Continuum Co., Inc. v. Incepts, Inc., 873 F.2d 801, 803 (5th Cir. 1989) ("Fed.R.Civ.P. 65(c) provides that a bond must be posted before a federal court may issue an interlocutory injunction," and "failure to require the posting of a bond or other security constitutes grounds for reversal of the injunction"). This court recently *1481 discussed the bond requirement extensively in Curtis 1000, Inc. v. Youngblade, 878 F.Supp. 1224, 1275-80 (N.D.Iowa 1995), and in Heather K. v. City of Mallard, Iowa, 887 F.Supp. 1249, 1267-68 (N.D.Iowa 1995). Although the court has found exceptions to the security requirement should be made in specific circumstances, see Heather K., 887 F.Supp. at 1268, the court finds no such circumstances presented here. Although any risk of financial burden to MCC, resulting from imposing upon it the necessity of litigating outside of its selected judicial district by a complete injunction against pursuing the Mississippi litigation, is significantly reduced by the limited TRO the court has actually chosen to impose, because of the preliminary nature of these proceedings, there is some possibility that blocking MCC from staying litigation in this forum, and thereby compelling MCC to litigate on two fronts at once, may impose some costs upon MCC that it should not have been compelled to bear. Therefore, the court will require Terra to post security in the amount of ten thousand dollars ($10,000) before the TRO shall issue.

III. CONCLUSION
Upon a careful, if preliminary, consideration of the factors for issuance of an injunction against parallel litigation in another forum articulated in Northwest Airlines, and some further equitable factors from the Dataphase analysis that this court finds may still be pertinent to the application to enjoin parallel litigation to some extent, the court finds that a properly limited TRO should issue. That TRO should enjoin MCC in litigation brought in Mississippi or any other forum from attempting to enjoin or stay this litigation brought in the Northern District of Iowa. A temporary restraining order to that effect shall therefore issue upon filing of proper security by Terra and shall last, in the first instance, for the period of 120 days.
Additionally, the court enters the following briefing schedule. Not later than sixty days (60) from the date of this order, the parties shall file motions to transfer or dismiss, or for permanent injunctions, as they deem appropriate. The parties shall thereafter have twenty-one days within which to respond to any motions filed by their opponent, and an additional seven days within which to file any reply briefs. The court will endeavor to hear the pending motions approximately ninety days from the date of this order and to render its decision within the duration of the TRO.
IT IS SO ORDERED.

TEMPORARY RESTRAINING ORDER
WHEREAS, pursuant to Fed.R.Civ.P. 65(b), the court finds that the present litigation should not be enjoined by order of any other court, defendant Mississippi Chemical Corporation is hereby temporarily restrained and enjoined from seeking an injunction or restraining order in litigation it has filed in Mississippi federal court or in any other litigation MCC may file in Mississippi or elsewhere enjoining in any way the present lawsuit between the parties in the United States District Court for the Northern District of Iowa. However, this TRO shall have no effect on discovery or on the parties' ability to file motions to transfer or dismiss, or on any other action in any lawsuit.
This temporary restraining order shall be binding upon the parties to this action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order. This temporary restraining order shall issue upon the giving of security of ten thousand dollars ($10,000) by applicant Terra International, Inc., and shall remain in full force and effect for the period of 120 days from the date of this order, or until such earlier date as it shall be dissolved by order of this court, or such later date as the court shall determine in a written order extending this temporary restraining order.
IT IS SO ORDERED.
NOTES
[1] A related lawsuit, Griffin, et al. v. Mississippi Chem. Corp., No. C95-4090 (N.D.Iowa), was also filed on August 31, 1995, at 3:22 p.m., against defendant Mississippi Chemical Corporation by seventy-two individual plaintiffs allegedly damaged by the explosion of the Terra plant on December 13, 1994, asserting causes of action against MCC based on theories of negligence and strict liability, and breach of express and implied warranties. A third lawsuit arising from the explosion of Terra's Port Neal facility, Sahlfeld, et al. v. Mississippi Chem. Corp., No. C95-4092 (N.D.Iowa), was also filed in this district on September 1, 1995, at 4:35 p.m. That lawsuit also alleges negligence and strict liability causes of action and breach of express and implied warranties, as well as a claim for loss of consortium, against MCC.
[2] The negligence cause of action asserted in Count I of Terra's complaint is as follows:

20. At all relevant times, MCC, its agents, representatives, and employees had a duty to exercise due care and caution in designing the MCC Technology for use by Terra, and in providing sufficient, proper, and adequate advice, instructions, recommendations, warnings, inspections, start-up engineering assistance, and information to Terra to ensure that the design, construction, installation and use of the MCC Technology would be reasonably safe and proper, and would not create any dangerous conditions, foreseeable risks of harm, or unreasonably dangerous or unsafe defective conditions, including explosion of the ammonium nitrate solution being manufactured.
21. Notwithstanding the aforesaid duties and in breaches thereof, MCC, by and through its agents and/or employees acting within the course and scope of their agency and/or employment, negligently, carelessly and improperly created unreasonably dangerous conditions, and committed the following acts and/or omissions:
A. Negligently failed to properly and adequately research, design, test and inspect the MCC Technology, particularly with regard to explosion risks involving ammonium nitrate solution;
B. Negligently failed to properly and adequately research, design, test, and inspect the MCC Technology used in the ammonium nitrate neutralizer, nitric acid sparger, and related apparatus used at Terra's Port Neal, Iowa plant, for explosion risks involving ammonium nitrate solution including, but not limited to, the following:
(i) the nitric acid sparger design and dimensions created regions of ammonium nitrate in the neutralizer that were susceptible to detonation;
(ii) the location of the nitric acid sparger failed to minimize the effects of hydrostatic pressure, thereby increasing the susceptibility for detonation;
(iii) the ammonium nitrate neutralizer design failed to reasonably accommodate the predictable introduction of sensitizers in the neutralizer vessel;
(iv) the design of the ammonium nitrate neutralizer failed to include adequate instrumentation for detecting, monitoring, and controlling hot spots, and other undesirable conditions that could lead to a detonation;
(v) the design of the nitric acid sparger, particularly the location and size of the sparger's holes, failed to prevent the following conditions that contributed to the susceptibility of detonation:
(a) backflow of ammonium nitrate into the sparger when nitric acid flow is ceased;
(b) entrapment of ammonium nitrate in the sparger;
(c) formation and confinement of a "heel" of residual ammonium nitrate and contaminants (when present) inside the sparger;
(d) inability to properly drain all ammonium nitrate from the sparger;
(e) plugging of sparger holes during routine shutdowns;
(f) required use of plant steam to prevent solidified ammonium nitrate from plugging sparger holes;
(g) inability to continually purge sparger holes when appropriate;
(h) hole geometry that promoted ease of plugging;
(i) inadequate venting capacity that allowed pressure buildup in the sparger when ammonium nitrate decomposition occurs;
(j) creation of a zone of lower-density sensitized ammonium nitrate due to the presence of steam bubbles outside the nitric acid sparger when it is steam purged; and
(k) creation of a mixture of nitric acid and ammonium nitrate inside the nitric acid sparger during nitric acid feed interruption.
(vi) the material specified for the nitric acid sparger, titanium, is a material known or should have been known to increase the sensitivity of ammonium nitrate to decompose and to chemically react, generating heat and leading to detonation;
C. Negligently failed to properly prepare operating procedures for the MCC Technology, including shutdown procedures or any procedures that could be utilized to prevent or remove plugging of the holes of the nitric acid sparger;
D. Negligently failed to provide adequate and proper advice, warnings, recommendations, and/or instructions to Terra in connection with the safety hazards and risks associated with the MCC Technology, including contamination, temperature, pressure, pH, gas bubbles, density, critical mass, dangerous reactions, and materials of construction;
E. Negligently failed to provide adequate and proper training of Terra employees in the design, manufacture, installation, use, operation, maintenance, and inspection of the MCC Technology;
F. Negligently failed to warn Terra and others of the inherent hazards, dangers, and risks associated with the use of the MCC Technology;
G. Negligently failed to provide proper and adequate engineering services relating to the design, construction, installation, operation, maintenance, and inspection of the MCC Technology; and
H. It was otherwise careless and negligent.
22. As a direct and proximate result of MCC's negligent acts, carelessness, wrongdoing and omissions, a catastrophic explosion suddenly occurred without warning in the MCC designed ammonium nitrate neutralizer vessel at Terra's Port Neal, Iowa fertilizer plant on December 13, 1994, killing four persons, injuring eighteen other individuals, and causing substantial damages to Terra's real and personal property, the interruption of Terra's business, including substantial lost profits, and other related damages and losses.
[3] Terra's strict liability claim, Count II of its complaint, is as follows:

23. Defendant MCC is liable in strict liability in tort as contemplated by the Restatement of Torts, Section 402(A) for the reason that the design of the MCC Technology was unreasonably dangerous and defective, and which unreasonably dangerous and defective conditions existed with the MCC Technology.
24. The MCC Technology licensed to Terra was used in the intended manner and/or in a manner reasonably foreseeable by MCC.
25. The unreasonably dangerous and defective conditions present in the MCC Technology were unknown to Terra, and were a proximate cause of the December 13, 1994 explosion, causing substantial damages to Terra's real and personal property, the interruption of Terra's business, including substantial lost profits, and other related damages and losses.
[4] Count I of MCC's complaint is as follows:

17. The statements contained in Terra's report, Terra's press release, and Rosenbury's address that Mississippi Chemical's design was unsafe allege a defect in Mississippi Chemical's design resulting from errors in the information contained in the design manual. These statements thus have created an actual and substantial controversy between Mississippi Chemical and Terra as to whether Mississippi Chemical satisfied its obligations under the Licensing Agreement and could subject Mississippi Chemical to liability to Terra.
18. The publication of Terra's report and Terra's press release to the general public has called the safety of Mississippi Chemical's design into question and could subject Mississippi Chemical to liability to third parties such as the Terra employees who were injured in the explosion, representatives of those employees who were killed in the explosion, or third parties who experienced any related property damage.
19. The publication of Terra's report and Terra's press release to governmental agencies investigating the cause of the Iowa explosion, including the Occupational Health and Safety Administration and the Environmental Protection Administration, could subject Mississippi Chemical to further administrative inquiry arising out of the explosion.
20. The publication of Terra's report, Terra's press release, and Rosenbury's address to other licensees of Mississippi Chemical's neutralizer technology has resulted in numerous inquiries concerning the safety of Mississippi Chemical's design. Terra's statements have cast a cloud over the safety of the design, creating a possibility that the licensees will insist on redesign and/or replacement of their neutralizers, at Mississippi Chemical's expense, and could subject Mississippi Chemical to liability to the licensees.
21. The publication of Terra's report, Terra's press release, and Rosenbury's address to prospective licensees has created a substantial likelihood that Mississippi Chemical will be unable to enter into licensing agreements with those prospective licensees until the safety issue is resolved.
22. In an effort to prove that the conclusions contained in Terra's report are self-serving and erroneous, and to remove any concerns regarding the safety of Mississippi Chemical's design, Mississippi Chemical recently requested access to the information on which Terra's report is based. As the letter attached as Exhibit D reflects, however, Terra refused to make any of the information available. Accordingly, Mississippi Chemical's only means to obtain access to this information is through these proceedings.
23. The statements contained in Terra's report, Terra's press release, and Rosenbury's address thus give rise to an "actual controversy" between the parties within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201(a), and entitle Mississippi Chemical to declaratory relief.
[5] Count II of MCC's complaint is as follows:

25. The statements contained in Terra's report, Terra's press release, and Rosenbury's address were false, untrue, and defamatory. The statements were intended to and did injure Mississippi Chemical's reputation; expose it to public hatred, contempt, or ridicule; degrade it in society; lessen it in public esteem and lower it in the confidence of the community; and deter third persons from associating or dealing with it.
26. The defamatory statements contained in Terra's report, Terra's press release, and Rosenbury's address were not privileged.
27. The defamatory statements contained in Terra's report, Terra's press release, and Rosenbury's address were made with knowledge that they were false or with reckless disregard for their truth or falsity. At minimum, the defamatory statements were made in negligent disregard of their truth or falsity.
28. The defamatory statements contained in Terra's report, Terra's press release, and Rosenbury's address were authorized by Terra, were made at Terra's express direction, and/or were made in the course and scope of the speakers' employment. Accordingly, Terra is liable for the defamatory statements contained in the report, the press release, and Rosenbury's address.
29. As a direct and proximate result of the defamatory statements contained in Terra's report, Terra's press release, and Rosenbury's address, Mississippi Chemical has suffered actual damages in an amount to be proved at trial; but at least in excess of $50,000, exclusive of interest and costs.
30. Because the defamatory statements contained in Terra's report, Terra's press release, and Rosenbury's address were made with knowledge of their falsity or in reckless disregard of their truth or falsity, Mississippi Chemical is entitled to an award of punitive damages in an amount sufficient to deter Terra, its agents, and others similarly situated from similar conduct in the future.
[6] In this preliminary telephone conference call on Labor Day, Terra was represented by counsel George Zelcs of Clausen Miller, P.C., in Chicago, Illinois, Jonathan Jay of Zelle & Larson in Dallas, Texas, and local counsel Gregg Williams of Heidman, Redmond, Fredregill, Patterson, Schatz & Plaza, L.L.P., in Sioux City, Iowa. MCC was represented by its local counsel, Steve Eckley and Randy Duncan of Duncan, Green, Brown, Langeness & Eckley, P.C., in Des Moines, Iowa.
[7] Fed.R.Civ.P. 65(b) provides extensive requirements for the issuance of a TRO when the adverse party receives no notice. However, in this case, the adverse party has been provided with notice and has appeared through counsel to argue the merits of a TRO.
[8] Those standards require that a preliminary injunction or TRO issue only after consideration of the following factors: (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties involved in the litigation; (3) the probability that the movant will succeed on the merits; and (4) the public interest. Dataphase, 640 F.2d at 113.
[9] In Boatmen's First Nat'l Bank, the court found that this requirement of adequate factual and legal findings comes from Fed.R.Civ.P. 52(a). Boatmen's First Nat'l Bank, 57 F.3d at 640. The court observed that

Rule 52(a) requires that, "in granting or refusing interlocutory injunctions the court shall ... set forth the findings of fact and conclusions of law which constitute the grounds of its action." The purpose of the rule is threefold: (1) to facilitate appellate review; (2) to make the district court's decision definite for purposes of res judicata; and (3) to prompt the district court "to fully and conscientiously consider the basis for [the] decision." Finney v. Arkansas Bd. of Correction, 505 F.2d 194, 212 n. 15 (8th Cir.1974).
Boatmen's First Nat'l Bank, 57 F.3d at 641. The court found that none of these purposes could be served by the inadequate written order and oral statements of the court on the record at the hearing, nor the court's identification of Northwest Airlines as the basis for its decision. Id. This court, mindful of the requirements of Rules 65 and 52, and the decisions in Boatmen's First Nat'l Bank and Northwest Airlines, will attempt to articulate adequately the factual and legal bases for its decision on Terra's application for a TRO to restrain specific conduct in MCC's lawsuit in Mississippi federal court.
[10] The court is certainly not suggesting at these preliminary stages of the proceedings that MCC's lawsuit is merely vexatious or not filed in good faith. MCC has offered a serious argument that all of this litigation must be pursued in Mississippi, because of a forum selection clause in the licensing agreement between the parties, and the court does not pretend to decide the merits of that argument here and now.
[11] The "public interest" factor involves, among other things, the "public's interest in minimizing unnecessary costs" to be met from public coffers. Baker Elec. Co-op, 28 F.3d at 1474 (citing James River Flood Control Ass'n v. Watt, 680 F.2d 543, 544-45 (8th Cir.1982) (per curiam)); James River Flood Control Ass'n, 680 F.2d at 544-45 (public interest served by avoiding "greater expenditures from the public treasury"). The public interest also favors enjoining false statements, and enjoining the safety risks arising from false labeling of products. Sanborn Mfg. v. Campbell Hausfeld/Scott Fetzer Co., 997 F.2d 484, 490 (8th Cir. 1993).
[12] For example, MCC has suggested that a forum selection clause in its licensing agreement with Terra will require that this lawsuit and its own be resolved in Mississippi. Although MCC suggested that for similar reasons no TRO should issue, the court expresses no view on the merits of that argument whatsoever, because it has not been able to accord the parties any opportunity to brief or argue the question. Because a TRO merely maintains the status quo, however, the court does not believe that its inability to resolve that question at this stage of the proceedings will prejudice MCC in any way, because MCC may mount such an argument in response to an application for a permanent injunction.